Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL DIVERSITY;
CRAIG MILLER,
                    *Petitioners,*

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
                    *Respondent,*

NATIONAL ASSOCIATION OF HOME
BUILDERS; STATE OF ARIZONA;
ARIZONA CHAMBER OF COMMERCE,
                    *Intervenors.*

No. 03-71439

EPA No.
67-Reg. 79629

DEFENDERS OF WILDLIFE;
CENTER FOR BIOLOGICAL DIVERSITY,
            *Plaintiffs-Petitioners,*

            v.

ROBERT B. FLOWERS, Chief of
Engineers and Commander, US
Army Corps of Engineers.,
            *Defendant-Respondent,*

CHRISTINE TODD WHITMAN,
Administrator US Environmental
Protection Agency,
            *Defendant-Respondent,*

No. 03-72894

No. CV-02-
01195-CKJ

OPINION

10983

GALE NORTON; STEVEN WILLIAMS,
          *Defendants-Respondents,*

CONTINENTAL RESERVE II, LLC,
          *Defendant-Intervenor/*
                    *Intervenor,*

HB LAND DEVELOPMENT COMPANY;
STEPHEN A. OWENS, State of
Arizona, ex-rel, Director Arizona
Department of Environmental
Quality; GROSVENOR HOLDINGS;
NATIONAL ASSOCIATION OF HOME
BUILDERS; HOME BUILDERS
ASSOCIATION OF CENTRAL ARIZONA;
SOUTHERN ARIZONA HOME BUILDERS
ASSOCIATION; SAGUARO RANCH
INVESTMENTS LLC; SAGUARO RANCH
DEVELOPMENT CORPORATION,
          *Defendant-Intervenors/*
                    *Intervenors.*

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
November 1, 2004—San Francisco, California

Filed August 22, 2005

Before: Stephen Reinhardt, David R. Thompson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Thompson

**COUNSEL**

Michael P. Senatore (argued), Michael P. Senatore, Defenders of Wildlife, Washington, D.C., Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, D.C., Vera S. Kornylak, Arizona Center for Law in the Public Interest, Tucson, Arizona (on the brief), for the petitioners.

Robert L. Gulley (argued), Thomas L. Sansonetti, Robert L. Gulley, John M. Lipshultz, Andrew Mergen, U.S. Department

of Justice, Washington, D.C. (on the brief), for respondents Environmental Protection Agency and U.S. Fish and Wildlife Service.

James T. Skardon, Office of the Arizona Attorney General, Phoenix, Arizona, for intervenor State of Arizona.

Russell S. Frye, Collier Shannon Scott, P.L.L.C., Washington, D.C., for intervenors Arizona Chamber of Commerce, et al.

Norman D. James, Esq. (argued), Norman D. James, Thomas R. Wilmoth, Fennemore Craig, Phoenix, Arizona, for intervenors National Association of Home Builders, et al.

---

## OPINION

BERZON, Circuit Judge:

Under federal law, a state may take over the Clean Water Act pollution permitting program in its state from the federal Environmental Protection Agency (EPA) if it applies to do so and meets the applicable standards. This case concerns Arizona's application to run the Clean Water Act pollution permitting program in Arizona. When deciding whether to transfer permitting authority, the Fish and Wildlife Service (FWS) issued, and the EPA relied on, a Biological Opinion premised on the proposition that the EPA lacked the authority to take into account the impact of that decision on endangered species and their habitat.

The plaintiffs in this case challenge the EPA's transfer decision, particularly its reliance on the Biological Opinion's proposition regarding the EPA's limited authority. This case thus largely boils down to consideration of one fundamental issue: Does the Endangered Species Act authorize — indeed, require — the EPA to consider the impact on endangered and

threatened species and their habitat when it decides whether to transfer water pollution permitting authority to state governments? For the reasons explained below, we hold that the EPA did have the authority to consider jeopardy to listed species in making the transfer decision, and erred in determining otherwise. For that reason among others, the EPA's decision was arbitrary and capricious. Accordingly, we grant the petition and remand to the EPA.

## I.  Background

### A.  *The National Pollution Discharge Elimination System (NPDES)*

The Clean Water Act ("the Act"), passed in 1972, established the National Pollution Discharge Elimination ("pollution permitting") System. That System gave the EPA authority to issue permits for the discharge of pollutants into navigable waters. *See* 33 U.S.C. § 1342(a). The Act further provides that a state may apply to the EPA to administer the federal pollution permitting program regarding waters within its borders. § 1342(b). The EPA Administrator must determine whether the state has met nine specified criteria and "shall approve" state applications that meet those criteria. *Id.*

The state transfer provisions of § 1342(b) have proven popular. Arizona was the forty-fifth state to obtain pollution permitting authority from the EPA. *See* 67 Fed. Reg. 79,629 (Dec. 30, 2002) (announcing approval of Arizona's pollution permitting authority); 65 Fed. Reg. 50,528, 50,529 (Aug. 18, 2000) (listing then-approved states).

Once the EPA transfers a permitting program to a state government, the EPA Administrator maintains an oversight role to assure that the state follows Clean Water Act standards. 33 U.S.C. § 1342(c)(2). If the Administrator determines that the state is not following those standards, the Administrator must demand corrective action. If the state does

not take such action, the Administrator must withdraw approval of the state program. § 1342(c)(3).

## B. The Endangered Species Act

In 1973, one year after the enactment of the Clean Water Act, Congress passed the Endangered Species Act, "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The present case focuses on section 7 of the Endangered Species Act, 16 U.S.C. § 1536.

Section 7(a)(2) imposes substantive and procedural requirements on "each Federal agency" with regard to "any action authorized, funded, or carried out by such agency." 16 U.S.C. § 1536(a)(2). Each agency must "insure" that such actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id*. Agencies must use the "best scientific and commercial data available" to make such decisions, and must do so "in consultation with and with the assistance of the Secretary [of the Interior]." *Id.*

Endangered Species Act regulations[1] describe the consultation and action requirements imposed on agencies. Section 7's requirements apply "to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. An agency must determine if a proposed action "may affect" either endangered or threatened species (denominated "listed species," § 402.02) or those species' critical habitat, and, if so, must seek formal consultation with the FWS, or, for marine species, the National Marine Fisheries Service.

---

[1]The relevant Endangered Species Act regulations were jointly issued by the FWS, Department of the Interior, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, and Department of Commerce. *See* 50 C.F.R. ch. 4.

§ 402.14(a). During such consultations, the FWS issues a Biological Opinion analyzing whether the action is likely to jeopardize any listed species or its habitat. § 402.14(h). The federal agency then makes a final decision regarding whether and how to pursue the proposed action. § 402.15(a).

A Biological Opinion must include a "summary of the information on which the opinion is based," a "detailed discussion of the effects of the action on listed species or critical habitat," and "[t]he Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." § 402.14(h).

The "effects of the action" include "direct and indirect effects . . . together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline[, which] includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area." § 402.02. "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*

By its terms, section 7(a)(2) applies only to "federal agenc-[ies]," not to state governmental bodies. Accordingly, the EPA's pollution permitting decisions are subject to section 7(a)(2), but state pollution permitting decisions are not.

Noting that the "EPA now consults with the [FWS and National Marine Fisheries Service] under section 7 of the [Endangered Species Act] on . . . approval of State National Pollutant Discharge Elimination (NPDES) permitting programs" but recognizing that after transfer, section 7 will not apply to the state's permitting decisions, the EPA signed a Memorandum of Agreement with the FWS governing the two agencies' involvement with transferred pollution permitting programs. *See* 66 Fed. Reg. 11,202, 11,202, 11,207 (Feb. 22,

2001). Asserting that the "EPA's oversight includes consideration of the impact of permitted discharges on waters and species that depend on those waters," *id.* at 11,215, the Memorandum lists several procedures that the EPA and FWS will establish to ensure that they communicate federal endangered species concerns to state water pollution permitting agencies.[2] *Id.* at 11,216. The Memorandum is not, however, binding on states. *Id.* at 11,206 ("[T]he MOA . . . does not impose any requirements on States."). Rather, the EPA will "*encourage* the State . . . to facilitate the involvement of permittees" in the described processes. *Id.* at 11,216 (emphasis added).

### C. The EPA's approval of Arizona's pollution permitting transfer application

The State of Arizona (Arizona) applied on January 14, 2002 for transfer of pollution permitting authority regarding Arizona waterways (except those on Indian land). 67 Fed. Reg. 49,916, 49,917 (Aug. 1, 2002). Under that proposal, the Arizona Department of Environmental Quality (ADEQ) was to be responsible for issuing water pollution permits. The EPA's regional office in San Francisco determined that the transfer could affect listed species in Arizona and so initiated formal section 7 consultation with FWS. Announcing this decision, the EPA stated that "[s]ection 7(a)(2) of the [Endangered Species Act] places a statutory requirement (separate and distinct from [33 U.S.C. § 1342(b)]) for EPA to 'insure that any action authorized, funded or carried out [by EPA]' " is unlikely to jeopardize listed species or adversely modify their critical habitat, and that the EPA is therefore "required" to consult regarding the transfer decision. 67 Fed. Reg. at 49,917 (final alteration in original); *see also id.* at 49,919.[3]

---

[2]We discuss these procedures in more detail in Part III(D)(2)(a), *infra*.

[3]The EPA has followed the section 7 consultation process before transferring permitting authority to states for more than a decade. Every pollu-

During the course of the consultation, FWS field office staff in Arizona expressed serious reservations about the proposed transfer. FWS staff noted that section 7 consultations regarding past pollution permits in Arizona had led to mitigating measures to protect species' critical habitat, and feared that, without such mandatory consultation, Arizona would issue permits without mitigating measures. As a result, there could be harm to certain listed species and habitat, particularly the southwestern willow flycatcher, Pima pineapple cactus, Huachuca water umbel, cactus ferruginous pygmy owl,[4] "and perhaps other species." The staff concluded "that the transfer of this program from EPA to the State causes the loss of protections to species resulting from the section 7 process, and the impact of this loss must be taken into account in the

---

tion permitting transfer decision since 1993 has involved some form of EPA consultation with FWS regarding endangered species. *See* 66 Fed. Reg. 12,791 (Feb. 28, 2001) (Maine); 63 Fed. Reg. 51,164 (Sept. 24, 1998) (Texas); 61 Fed. Reg. 65,047 (Dec. 10, 1996) (Oklahoma); 61 Fed. Reg. 47,932 (Sept. 11, 1996) (Louisiana); 60 Fed. Reg. 25,718 (May 12, 1995) (Florida); 59 Fed. Reg. 1535, 1543 (Jan. 11, 1994) (announcing 1993 approval of South Dakota's application after FWS consultation). Earlier pollution permitting transfer decisions do not appear to have been preceded by Endangered Species Act consultation. *See, e.g.,* 52 Fed. Reg. 27,578 (July 22, 1987) (Utah); 51 Fed. Reg. 44,518 (Dec. 10, 1986) (Arkansas); 49 Fed. Reg. 39,063 (Oct. 3, 1984) (Rhode Island); 47 Fed. Reg. 17,331 (Apr. 22, 1982) (New Jersey); 44 Fed. Reg. 61,452 (Oct. 25, 1979) (Alabama); 39 Fed. Reg. 26,061 (July 16, 1974) (announcing approval of applications from fifteen states in the early years of Clean Water Act operation).

[4]We note that FWS has proposed removing the pygmy owl from the list of threatened and endangered species, although the owl currently remains listed. *See* 70 Fed. Reg. 44,547 (Aug. 3, 2005). Even if the FWS eventually de-lists the pygmy owl, that would not affect our analysis of this case for two reasons. First, we focus on the agency's action based on the record before it, which includes the pygmy owl's listed status. Second, the EPA's action can affect multiple listed species in Arizona, not only the pygmy owl. While we illustrate our analysis with examples of individual listed species, including the pygmy owl, our analysis applies with equal force even if the FWS de-lists any such species.

effects analysis in the biological opinion." In response, EPA staff opined that the EPA lacked the legal authority to base its transfer decision on these concerns, because the agency does "not have the legal authority to regulate the non-water-quality-related impacts associated with State NPDES-permitted projects that are of concern to FWS, including the authority to object to such permits based on non-water quality related impacts to listed species."

To resolve this disagreement, staff of the two agencies developed an "Interagency Elevation Document," summarizing their respective opinions. Pursuant to the Memorandum of Agreement, this document transferred authority over the Biological Opinion to the Director of FWS, the Director of the National Marine Fisheries Service, and the Deputy Assistant Administrator of Water at the EPA. *See* 66 Fed. Reg. 11,202, 11,209 (Feb. 22, 2001).

After the consultation at the national level between the EPA and FWS, the Field Supervisor of the Arizona Ecological Services Field Office of the FWS issued a Biological Opinion recommending approval of the transfer of permitting authority to Arizona. Noting the loss of section 7 consultation, the Biological Opinion recognized that, after the transfer, no federal agency would have the legal authority to consult with developers concerning the potential impact on listed species of any pollution permits. Such consultation had lead to measures protecting listed species, including the Pima pineapple cactus, razorback sucker, Gila topminnow, southwestern willow flycatcher, and cactus ferruginous pygmy owl. Although Arizona could voluntarily consult with FWS regarding pollution permits, neither the EPA nor FWS could *require* Arizona to act on behalf of listed species.

After recognizing this impact of the transfer of permitting authority, the Biological Opinion concluded that the

> loss of any conservation benefit is not caused by EPA's decision to approve the State of Arizona's

program. Rather, the absence of the section 7 process that exists with respect to Federal [Clean Water Act] permits reflects Congress' decision to grant States the right to administer these programs under state law provided the State's program meets the requirements of 402(b) of the Clean Water Act.

The Biological Opinion goes on to conclude:

While reviewing this above referenced approval, the FWS has spent considerable time analyzing direct and indirect effects. In the course of this analysis, our field office staff biologists have expressed concerns that the approval will result in loss of section 7 consultation-related conservation benefits. We have stated our belief that the loss of section 7 conservation benefits is an indirect effect of the authorization. Furthermore, we have stated that this loss of conservation benefits will appreciably reduce the conservation status of the cactus ferruginous pygmy-owl and the Pima pineapple cactus. Notwithstanding this, our final opinion is that the loss of section 7-related conservation benefits, which would otherwise be provided by section 7 consultations, is not an indirect effect of the authorization action.

In changing from a Federal permitting program to a State permitting program, the permit-related section 7 processes for consultation will no longer apply. Essentially, there will be no substantive change in the permit program, but there will be a reduction in the number of mechanisms available to both of our agencies to protect federally-listed species and critical habitat in Arizona. We believe that the assumption of the program by the State of Arizona will not cause development, and concur that EPA's [Clean Water Act]-mandated approval of the program has only an attenuated causal link to the

reduction in Federal [Endangered Species Act] con-
servation responsibilities.[5]

As an alternative to this lack-of-causation analysis, the Bio-
logical Opinion stated that other federal and state laws would
sufficiently protect endangered species, so that transfer of per-
mitting authority would not likely jeopardize such species or
their critical habitat. These other laws included section 9 of
the Endangered Species Act, 16 U.S.C. § 1538, which outlaws
"taking" an endangered species. The Biological Opinion's
reliance on this statute contrasted with earlier FWS staff con-
cerns that "section 9 does not generally apply to plant species
(such as the Pima pineapple cactus) and it is not effective for
extremely rare, but wide-ranging species (such as the cactus
ferruginous pygmy-owl). FWS therefore does not believe that
section 9 enforcement offsets the effects of approving this
program."

Independently of the Biological Opinion, an official at the
Arizona Game and Fish Department[6] indicated that his depart-
ment had "worked cooperatively with ADEQ" when review-
ing past water pollution permit applications and "look[ed]
forward to continuing this level of cooperation between our
agencies." Noting the EPA-FWS Memorandum of Agree-
ment, the official asserted that "[t]his agreement will serve as
a guideline for EPA, FWS, and the State of Arizona to ensure
that NPDES permits will not negatively impact endangered

---

[5]The just-quoted passage mentioned two species in passing in the midst
of concluding that any harm to those species was not an indirect effect of
the EPA's transfer decision. Elsewhere, the Biological Opinion noted the
listed species in Arizona but did not specifically discuss the effect of the
transfer on any of these species.

[6]The official, Bob Broscheid, whose title at the Arizona Game and Fish
Department is "Project Evaluation Program Supervisor," wrote to an offi-
cial at the EPA's regional office that would supervise Arizona's permitting
decisions. He also carbon copied an ADEQ official. Broscheid's letter
describes the Game and Fish Department's understanding of its role but
does not purport to speak for ADEQ.

and threatened species." The EPA's response to the Game and Fish Department official's statement was: "EPA appreciates the commenter's support. As with all comments submitted, we have considered these comments in making our final determination on the application."

FWS staff had earlier suggested the development of a formal memorandum of understanding with ADEQ or the Arizona State Lands Department, but did not mention the Game and Fish Department. No such memorandum of understanding was ever signed, and no official from either ADEQ or the State Lands Department submitted a letter similar to the Game and Fish Department letter.

The EPA approved the permitting authority transfer two days after the FWS issued the Biological Opinion, *see* 67 Fed. Reg. 79,629 (Dec. 30, 2002), noting its belief that the Biological Opinion "appropriately considered all relevant information regarding the effects of the approval." The Arizona Department of Environmental Quality (ADEQ) currently operates the program, issuing permits for water pollution. *See ADEQ: Permits, at* http://www.azdeq.gov/environ/water/permits/ index.html (last visited July 5, 2005).

Petitioners, Defenders of Wildlife, the Center for Biological Diversity, and Craig Miller, a resident of Pima County, Arizona (collectively, Defenders) challenge the pollution permitting transfer in two lawsuits, consolidated before us. In the first, Defenders filed a petition for review of the EPA's transfer decision with this court. The petition alleges that the EPA failed adequately to consider the transfer's impact on endangered and threatened species and their habitat, and, in particular, that the EPA's reliance on the Biological Opinion violated the Endangered Species Act and was arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Three other sets of parties have since intervened, supporting the transfer but taking some issue with the EPA's administrative practices and reasoning: the National Associa-

tion of Home Builders and several Arizona home builders' associations (Home Builders); the Arizona Chamber of Commerce and several other business associations (Chamber); and Arizona.

Defenders also filed an Endangered Species Act and Administrative Procedure Act suit in district court in Arizona alleging, among other claims, that the Biological Opinion supporting the pollution permitting transfer does not comply with Endangered Species Act standards. The district court held that this court has exclusive jurisdiction over the Biological Opinion challenge pursuant to 33 U.S.C. § 1369(b)(1)(D), and ordered that challenge severed from other claims in the district court, transferred to this court, and consolidated with Defenders' suit challenging the EPA transfer.

## II. Jurisdiction & Standing

Before proceeding to the merits, we must satisfy ourselves that we have subject-matter jurisdiction over this case and that petitioners have standing to raise their claims. *See B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999). The Chamber contends this court lacks jurisdiction to hear Defenders' challenge to the Biological Opinion, and the Home Builders maintain that Defenders do not have standing to bring this action. Neither argument is convincing.

### A. Subject-Matter Jurisdiction

[1] "[A]ny interested person" may seek judicial review of the EPA Administrator's pollution permitting or state transfer decisions in the circuit court in which the person resides, so long as that circuit is directly affected by the Administrator's action. 33 U.S.C. § 1369(b)(1). Section 1369(b)(1)(D) grants this court subject matter jurisdiction to review "any determination as to a State permit program submitted under section 1342(b)." The Chamber argues that § 1369(b) authorizes review only of the EPA Administrator's transfer decision, not

of a Biological Opinion completed by the FWS that informs that decision.

[2] We disagree. The Supreme Court has noted that biological opinions typically have a "virtually determinative effect" on the ultimate agency action. *Bennett v. Spear*, 520 U.S. 154, 170 (1997); *see also id.* at 169 (noting that a Biological Opinion "in reality . . . has a powerful coercive effect on the action agency" with the potential to "alter[ ] the legal regime to which the action agency is subject"). It would be anomalous to review the ultimate agency "determination" while ignoring the reasoning contained in a biological opinion "virtually determinative" of that action.

The actual sequence of events in this instance in consistent with the Supreme Court's observations in *Bennett* regarding the impact of a biological opinion on an agency's final decision. The EPA Administrator's decisionmaking process before approving Arizona's permitting transfer application included section 7 consultation with FWS and the consideration of the Biological Opinion that resulted from it: The initial dispute between the EPA and FWS regarding the Biological Opinion was "elevated" to the national level, and the final Biological Opinion incorporated the results of consultation between the EPA and FWS. The final EPA decision, in turn, followed the issuance of the Biological Opinion by two days. In its unpublished Response to Comments regarding Arizona's application to assume permitting authority, released the same day as its final decision, the EPA noted that it had "considered the [biological] opinion of the FWS in proceeding with its approval action." The EPA went on to approve the Biological Opinion's conclusions, stating its determination that "FWS appropriately considered all relevant information regarding the effects of the approval action on listed species and designated and proposed critical habitat in arriving at its conclusion, including a broad range of direct and indirect effects of EPA's approval action," and declaring that "no information has been submitted which would indicate

that the conclusions in FWS's biological opinion are incorrect."

The EPA, as part of the statutorily mandated consultation process, approved of and relied upon the Biological Opinion when considering Arizona's transfer application. Evaluating the Opinion's evidentiary and analytic basis is thus integral to reviewing the EPA's final decision.[7]

[3] We conclude that we have jurisdiction to consider the adequacy of both the section 7 consultation and the Biological Opinion that resulted from it while reviewing the EPA's final decision.

### B. Standing

[4] Petitioners who "allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief" establish Article III standing. *Allen v. Wright*, 468 U.S. 737, 751 (1984). As Defenders' members meet this three-part test, Defenders has organizational standing to represent their interests.

Several Defenders' members reside in Arizona and photograph and observe in Arizona various named, listed species — such as the cactus ferruginous pygmy owl, Huachuca water umbel, and the other species noted in Part I.C, *supra* — and hike and camp in these species' various habitats. These members do so regularly and plan to continue doing so in the future, because, among other reasons, these activities bring them recreational, aesthetic, and spiritual fulfillment. The members' activities occur on and near land — such as the upper San Pedro River region, the Sonoran Desert near

---

[7]The EPA does not argue otherwise. Indeed, the EPA's argument in this court largely replicates the Biological Opinion's reasoning, confirming that the reasoning was a key factor in its decision.

Saguaro National Park and Tortolita Mountains Park, and the Verde River region — where significant commercial and residential development is taking place, development that depends on water pollution permits. The members assert, consistently with the Biological Opinion, that section 7 consultation has in the past led to mitigation measures by real estate developers in these areas and has thereby protected listed species and their habitat. They further assert that the loss of section 7 consultation would mean that developers of future projects would not engage in such mitigation measures and that listed species, and the members' interest in their activities involving them, would thereby be harmed.

**[5]** The members thus "observe[ ] or work[ ] with . . . particular animal[s and plants] threatened by a federal decision," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992); allege a harm to those animals and their habitat throughout Arizona; and assert "that [they have] an aesthetic or recreational interest in a particular place, or animal, or plant species . . . impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 182-83 (2000)); *see also Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1109-10 (9th Cir. 2002) (holding that regular "recreation and nature appreciation" on land covered by challenged agency action established injury-in-fact). Those allegations meet the criteria for demonstrating an adequate injury in an environmental case.

The Home Builders argue that alleging harm throughout the state of Arizona cannot establish standing, because the state encompasses too large an area to permit a sufficiently specific injury-in-fact allegation. The Defenders' members who filed declarations, however, mention specific subareas within the state where they engage in activities related to particular listed species and where development is occurring. Our cases require no greater precision. *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1993); *see also Kootenai Tribe*, 313

F.3d at 1110 (finding standing where party alleged harm to 58.5 million acres of land). Moreover, in light of the statewide impact of the EPA's transfer decision, alleging an injury-in-fact covering large areas within the state simply reflects the relatively broad nature of the potential harm.

[6] The alleged injuries are fairly traceable to the EPA's pollution permitting transfer decision. As alleged by Defenders, that decision will remove water pollution permitting decisions from the significant protections provided by section 7.

[7] Finally, the alleged injuries would be redressable by a court order vacating or mitigating the EPA's transfer decision. The protections accorded by the Endangered Species Act would then come back into operation.

Additionally, section 7(a)(2) of the Endangered Species Act contains *both* substantive and procedural requirements, and the plaintiffs in this case have alleged violations of *both* requirements. They thus have alleged, in addition to substantive noncompliance, "procedural" harms, as described in *Lujan* and subsequent cases — here, lack of adequate consultation between the EPA and the FWS, including reliance on a legally improper Biological Opinion.

Reliance on procedural harms alters a plaintiff's burden on the last two prongs of the Article III standing test. *See Lujan*, 504 U.S. at 572 n.7. To establish standing by alleging procedural harm, the members must show only that they have a procedural right that, if exercised, *could* protect their concrete interests and that those interests fall within the zone of interests protected by the statute at issue. *See Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1015 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004); *Tyler v. Cuomo*, 236 F.3d 1124, 1136 (9th Cir. 2000); *Churchill County v. Babbitt*, 150 F.3d 1072, 1077 (9th Cir. 1998), *amended by* 158 F.3d 491 (9th Cir. 1998).

The members have met these procedural harm requirements. They have, first, established a reasonable probability that the challenged action will threaten their concrete interests. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003); *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 n.6 (9th Cir. 1995). We held in *Citizens for Better Forestry* that violating the procedural requirements for forestry decisions meets that bar, as the violation lessens the likelihood that environmental considerations will be attended to in making those decisions. *Id.* at 972-75. Similarly, the use of improper section 7 consultation by reason of an inadequate biological opinion lessens the likelihood that the impact of the proposed action on listed species and their habitats will be recognized and accounted for in making the transfer decision. *See id.* at 972.

An association has standing to sue on behalf of its members who have individual standing if "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. The interests at stake — the protection of endangered species — plainly relate to Defenders' mission. Nor does this lawsuit require the active involvement of individual members, as the relief sought will run equally to all of them.

**[8]** Accordingly, we hold that Defenders has standing to challenge the EPA's pollution permitting transfer decision. *See Defenders of Wildlife v. Flowers*, No. 03-16884, Slip Op. at 8108 (9th Cir. 2005) (holding that Defenders has standing to challenge particular construction permits in Arizona because of "their members' interest" in species that might live where construction would occur).

### III. The Merits

### A. Standard of Review

Under the Endangered Species Act, each agency has an obligation to "insure" that any action it takes is "not likely to jeopardize" listed species or their critical habitats. *See* § 1536(a)(2);[8] 50 C.F.R. § 402.15(a) (requiring each agency to determine how to proceed "in light of its section 7 obligations and the Service's biological opinion"). Defenders allege that the EPA failed to satisfy this obligation and thus acted arbitrarily and capriciously, in violation of the Administrative Procedure Act.[9] *See* 5 U.S.C. § 706(2)(A); *Am. Mining Cong. v. EPA*, 965 F.2d 759, 763 (9th Cir. 1992) (applying

---

[8]The relevant portions of section 7(a) of the Endangered Species Act provide:

> (1) The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

> (2) Each Federal agency *shall*, in consultation with and with the assistance of the Secretary, *insure that any action authorized, funded or carried out* by such agency (hereinafter in this section referred to as an "agency action") *is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical*, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. §§ 1536(a)(1)-(2) (emphasis added).

[9]All parties agree that arbitrary and capricious review applies to Defenders' petition for review.

§ 706(2)(A) arbitrary and capricious review to § 1369(b) petition).

An agency decision will survive arbitrary and capricious review if it is

> rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. . . . Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (citations omitted). Agency decisions may not, of course, be inconsistent with the governing statute. 5 U.S.C. § 706(2)(A) (instructing courts to "set aside" agency action "not in accordance with law"). Also, internally contradictory agency reasoning renders resulting action "arbitrary and capricious;" such actions are not " 'founded on a reasoned evaluation of the relevant factors.' " *Ariz. Cattle Growers' Ass'n v. U.S. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)); *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (finding agency action "arbitrary and capricious" because it was "internally inconsistent and inadequately explained").

Defenders allege, in particular, that the EPA's reliance on the Biological Opinion was arbitrary and capricious, as the Biological Opinion is itself invalid. *See Res. Ltd.*, 35 F.3d at 1304 (holding that an action agency may not arbitrarily and capriciously rely on a flawed biological opinion); *Pyramid*

*Lake Paiute Tribe v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) (same). An agency can satisfy the arbitrary and capricious standard of review, however, even if it relies on an "admittedly weak" Biological Opinion, if there is no "information the Service did not take into account which challenges the [biological] opinion's conclusions." *Id.* at 1415 (*cited in Res. Ltd.*, 35 F.3d at 1304). The upshot is that we must consider whether the EPA, through the Biological Opinion or otherwise, considered all the relevant Endangered Species Act factors and offered an explanation for its decision that is both "plausible" and internally coherent.

Applying this test, we first examine the consistency of the EPA's reasoning. Next, we examine the Biological Opinion, including its legal conclusion regarding the effects of the transfer decision on listed species and their habitat. We then review the other information relied on by the EPA.

### B. Coherent reasoning?

As an initial matter, the EPA's approval of Arizona's transfer application cannot survive arbitrary and capricious review because the EPA relied during the administrative proceedings on legally contradictory positions regarding its section 7 obligations. Its reasoning was therefore "internally inconsistent and inadequately explained." *Gen. Chem. Corp.*, 817 F.2d at 857.

The EPA definitively stated several times during the decisionmaking process, including when announcing its final decision, that section 7 requires consultation regarding the effect of a permitting transfer on listed species. The agency so stated when announcing its Memorandum of Agreement with the FWS, *see* 66 Fed. Reg. 11,202, 11,206 (Feb. 22, 2001); when announcing that it had initiated section 7 consultation regarding Arizona's application because, pursuant to 50 C.F.R. § 402.14(a), approving that application "may affect" listed species, *see* 67 Fed. Reg. 49,916, 49,917, 49,919 (Aug.

1, 2002); when responding, in an unpublished document, to comments regarding Arizona's application (noting that "[t]here is no doubt" that the pollution permitting transfer "is an action mandating formal consultation under section 7"); and when announcing the approval of Arizona's application. *See* 67 Fed. Reg. 79,629, 79,630 (Dec. 20, 2002) (noting that section 7(a)(2) generally "requires" consultation and that the EPA consulted with FWS "under section 7(a)(2)").

Also, before deciding that consultation was necessary, the EPA first determined that transferring pollution permitting authority to Arizona "may affect" listed species and their critical habitat. *See* 50 C.F.R. § 402.14(a) (requiring consultation when an agency determines its action "may affect" listed species or critical habitat). The EPA, in its unpublished biological evaluation, made this determination in recognition that in the absence of section 7 consultation on each permitting decision, "there will be a reduction in the number of mechanisms available to the [FWS] to protect Federally-listed species and designated critical habitat in Arizona."

Despite the lucidity and consistency of its position on the consultation point in the administrative proceedings, in litigation the EPA's lawyers have taken varying stances on the same issue. Before the Fifth Circuit, the EPA "suggest[ed]" that section 7 compelled consultation regarding pollution permitting transfers and, when necessary to protect species, allowed conditioning such transfers on formal agreements requiring states to follow section 7 procedures when issuing permits. *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998). The Fifth Circuit rejected the latter position and did not address the former. *Id.* at 298 & n.6.

The EPA's brief in this case states that *American Forest* "supports a finding that EPA lacks" authority to protect endangered species when considering pollution permitting approvals. The same brief, however, maintains that we need not decide the question because the agency did not rely on

this position in its decision in this case. At oral argument, the EPA declined to take a position as to whether it has an obligation under section 7(a)(2) to consult with FWS with regard to permitting transfer decisions — even though, during the decisionmaking process, the agency unequivocally stated several times that it does have such an obligation.

The EPA's post-decision equivocation cannot have any impact on our consideration of the validity of the transfer decision. We must review the EPA's actions based on the "grounds . . . upon which the record discloses that its action was based." *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80, 87 (1943); *see also Gifford Pinchot Task Force v. U.S. FWS*, 378 F.3d 1059, 1072 n.9 (9th Cir. 2004). The record shows unequivocally that the EPA based the action under review in this case on its belief that section 7 required consultation. We must judge its reasoning taking that position into account.

Doing so, we conclude that the obligation to consult — which, under the regulations, applies only to federal agency actions that "may affect" listed species, 50 C.F.R. § 402.14(a) — and the reasons given in the Biological Opinion for concluding that the transfer decision would not have an indirect effect on endangered species cannot coexist under section 7(a)(2). The Biological Opinion reasoned that there could be no such effect, because (1) the EPA has no authority to disapprove transfer applications because of an impact on listed species, section 7(a)(2) of the Endangered Species Act notwithstanding; (2) any impact on the post-transfer protection of listed species was the result of Congress' determination that states have no consultation or mitigation obligations, not of the transfer decision; and (3) the potential future impact on listed species would be caused entirely by new private development, and the transfer decision would not cause such development. By relying on this line of reasoning after determining that it did have a consultation obligation, the EPA decided that it had to consult but had no authority to do anything concerning the matter about which it had to consult. One would

not expect that Congress would set up such a nonsensical regime. Not surprisingly, it did not.

**[9]** Section 7(a)(2) makes no legal distinction between the trigger for its *requirement* that agencies consult with FWS and the trigger for its *requirement* that agencies shape their actions so as not to jeopardize endangered species.[10] Instead, in one, integrated provision, the statute provides that agencies "shall, in consultation with and with the assistance of the [FWS], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." An agency's obligation to consult is thus *in aid of* its obligation to shape its own actions so as not to jeopardize listed species, not independent of it. *Both* the consultation obligation and the obligation to "insure" against jeopardizing listed species are triggered by "any action authorized, funded, or carried out by such agency," and *both* apply if such an "action" is under consideration.

**[10]** This being the case, the two propositions that underlie the EPA's action — that (1) it must, under the Endangered Species Act, consult concerning transfers of CWA permitting authority, but (2) it is not permitted, as a matter of law, to take into account the impact on listed species in making the transfer decision — cannot both be true. Because the agency's decisionmaking was based on contradictory views of the same words in the same statutory provision, the ultimate decision was not the result of reasoned decisionmaking.

---

[10]As described above, section 7 consultation is triggered by a determination that an agency action "may affect" listed species, 50 C.F.R. § 402.14(a), and an obligation to act to mitigate harm to such species is triggered if the FWS determines that the agency action is "likely to jeopardize" listed species or "adverse[ly] modif[y]" their habitat. § 402.14(h). If an agency action *cannot* legally affect listed species — as the Biological Opinion concludes regarding the EPA's approval of Arizona's application — then the "may affect" standard is not met.

**[11]** Additionally, the third prong of the Biological Opinion's reasoning — that it is private development, not the EPA's transfer decision, that would cause any impact on listed species — suffers from an independent lack of plausibility. Events can, of course, have more than one cause. Events can be caused by several actions in a "but-for" causal chain. If any one of the necessary actions does not take place, the ultimate event does not occur. *See, e.g., Olympic Airways v. Husain*, 540 U.S. 644, 653 (2004) ("[T]here are often multiple interrelated factual events that combine to cause any given injury."). Obviously, without private decisions to construct new developments, there will be no Clean Water Act construction permits and no impact from the issuance of such permits on listed species or their habitats. Just as obviously, without the transfer of permitting authority from the federal to the state government, developers could be required, as they were before the transfer decision, to mitigate any impact from their development on listed species. So the impact of private development will be different depending upon whether the federal or state government does the permitting. In other words, the two sets of decisions *together* — the private development decisions and the governmental transfer decision — but not either one independently, have the potential to affect listed species and their habitat. The Biological Opinion's determination to the contrary disregards the obvious cause analysis and thus fails the reasoned decisionmaking standard.

**[12]** For these reasons, the transfer decision cannot stand. We must remand to the agency for a plausible explanation of its decision, based on a single, coherent interpretation of the statute.

## C. *Statutory power to protect species?*

Even viewed in isolation, the first explanation for the EPA's no impact conclusion — that the loss of section 7 consultation was not an effect of its transfer decision because the

agency had no authority to base its transfer decision on the loss of consultation — fares no better.

Under the statutory regime, the statutory obligation is to "insure" against likely jeopardy of listed species. The two critical factors triggering this obligation are (1) that the "action" be one for which the agency can fairly be ascribed responsibility, namely, an action "authorized, funded or carried out" by the agency; and (2) that there is the requisite nexus to an impact on listed species, namely, a direct or indirect effect "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." 16 U.S.C. § 1536(a)(2). There are, consequently, three relevant statutory concepts governing the reach of section 7(a)(2): the nexus to any impact on listed species, the nature of the obligation to "insure" against jeopardizing listed species, and the actions covered.

### 1. Nexus

[13] The case law indicates that a negative impact on listed species is the likely direct or indirect effect of an agency's action only if the agency has some control over that result. Otherwise, the requisite nexus is absent.

A seminal section 7 indirect effects case, *National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir. 1976), held that the Department of Transportation was responsible for development encouraged by interstate highway construction, because the Department did "control this development to the extent that [it] control[s] the placement of the highway and interchanges." *Id.* at 374. Recently, the Supreme Court in *Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004) endorsed a similar standard to that used in *National Wildlife Federation*, albeit under a different statute.

*Public Citizen* concerned the application of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370f,

regulations to the U.S. Department of Transportation's (DOT) regulations governing safety rules for Mexican trucks traveling on American roads. The NEPA regulations share with the Endangered Species Act regulations a similar definition of "indirect effects." *Compare* 40 C.F.R. § 1508.8(b) ("Indirect effects . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.") *with* 50 C.F.R. § 402.02 ("Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.").

The question in *Public Citizen* was whether DOT was required under NEPA to develop an environmental impact statement with regard to the pollution caused by the entry of Mexican trucks onto United States highways under the North American Free Trade Agreement. The Court held "that where an agency has no *ability to prevent a certain effect due to its limited statutory authority over the relevant actions*, the agency cannot be considered a legally relevant 'cause' of the effect." *Pub. Citizen*, 541 U.S. at 770 (emphasis added); *see also id.* at 767 (analogizing "cause" inquiry for purpose of defining "indirect effects" to proximate cause inquiry in tort law).

**[14]** Given the similarity in the applicable regulations, we adopt the *Public Citizen* standard for purposes of determining the likely effects of agency action under section 7(a)(2) of the Endangered Species Act. Accordingly, deciding whether the Biological Opinion followed Endangered Species Act regulations defining "indirect effects" requires us to determine whether the EPA can consider and act upon the loss of section 7 consultation benefits in deciding whether to transfer pollution permitting authority to Arizona. If so, then the EPA's transfer decision can be a cause of the loss of section 7 consultation benefits; the loss of those benefits should have been included in the Biological Opinion as an indirect effect of the potential transfer decision; and the loss of those benefits should have been considered and acted upon by the EPA.

*2. "Insure that any action . . . is not likely to jeopardize
the continued existence of any [listed] species"*

Authority over the loss of section 7(a)(2) consultation could be grounded in either the Clean Water Act or the Endangered Species Act. The former option is not presented here,[11] so we focus on whether the obligation in section 7(a)(2) to "insure" against jeopardizing listed species empowers the EPA to make decisions to preserve listed species and their habitat even if the Clean Water Act does not so specify. If so, then the EPA has the authority — indeed, because section 7(a)(2) speaks in mandatory terms, the duty — to deny a pollution permitting transfer application that meets Clean Water Act standards but would jeopardize protected species.

The language in section 7(a)(2) providing that each federal agency "shall . . . insure that any action authorized, funded or carried out by such agency"[12] will not jeopardize listed species or their critical habitat is addressed to each agency, without exception. Our question is: what does it require each agency to do?

[15] The ordinary meaning of "insure" as used in this context requires agencies to take action, as dictionary definitions make clear. To "insure" is "[t]o make (a person) sure (of a thing)" and "[t]o make certain, to secure, to guarantee (some thing, event, etc.)").[13] VII THE OXFORD ENGLISH DICTIONARY

---

[11]No party questioned the EPA's determination that Arizona's transfer application met the Clean Water Act factors. *Cf. Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 298 (5th Cir. 1998) ("EPA's discretion lies . . . in ensuring that those [§ 1342(b)] criteria are met.").

[12]We refer to such actions as "agency actions."

[13]This definition is consistent with those in dictionaries in print at the time Congress enacted the Endangered Species Act in 1973. *See, e.g.*, WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 466, 731 (2d College Ed. 1972) (defining "insure" as "same as ensure," which is defined as "to make sure or certain; guarantee; secure").

"Insure" has multiple definitions, but the alternatives are inapposite to section 7(a)(2). They include "to pledge one's credit," "to engage by pledge or contract," and "to secure the payment of a sum of money in the event of loss." THE OXFORD ENGLISH DICTIONARY 1059 (2d ed. 1989).

1059 (2d ed. 1989) (emphasis removed). Unless an agency has the authority to take measures necessary to prevent harm to endangered species, it is impossible for that agency to "make certain" that its actions are not likely to jeopardize those species. Otherwise, agencies would be forced to choose between violating section 7's prohibition on agency actions that are likely to jeopardize listed species and acting beyond their powers to protect such species.

The Supreme Court's seminal section 7 case, *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180 (1978), confirms this textual interpretation:

> One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words *affirmatively command* all federal agencies 'to *insure* that actions *authorized, funded*, or *carried out* by them do not *jeopardize* the continued existence' of an endangered species or '*result* in the destruction or modification of habitat of such species. . . .' This language admits of no exception.

437 U.S. at 173 (first alternation added, other alterations in original) (citation omitted).[14] An "affirmative command" by a

---

[14]The Chamber refers to a case of this court as purportedly limiting *Hill*, *National Wildlife Federation v. Burlington Northern Railroad, Inc.*, 23 F.3d 1508 (9th Cir. 1994). This court cannot, of course, limit any holding of the Supreme Court; only the Court or, for statutory cases, Congress may do that. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

Further, *National Wildlife Federation* was not a case concerning a federal action, and therefore did not raise any section 7(a)(2) issue. Moreover *National Wildlife Federation* merely supports the obvious proposition that a preliminary injunction is an equitable remedy and a court need not grant an injunction "for every violation of law." 23 F.3d at 1512.

Finally, far from abandoning the statutory interpretation in *Hill*, the Supreme Court has since *National Wildlife Federation* relied on and quoted *Hill* in reiterating the conclusion that "Congress[ ] inten[ded] to provide comprehensive protection for endangered and threatened species." *See Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 699 (1995).

superior authority — here, Congress — ordinarily carries with it both the obligation and the authority to obey that command. For example, despite policy arguments in favor of continuing construction of the dam, the Court in *Hill* relied on Congress's use of "the plainest of words" and section 7's equally plain legislative history, *id.* at 194, to hold that further construction was in "irreconcilable conflict" with section 7. *Id.* at 193; *see also id.* at 184 ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost.").

**[16]** *Hill's* analysis of the legislative history of the Endangered Species Act confirms that the authority conferred on agencies to protect listed species goes beyond that conferred by agencies' own governing statutes. *Hill* noted that earlier endangered species legislation, as well as earlier versions of the bills that became the present Endangered Species Act, included the qualifier "insofar as is practicable and consistent with [an agency's] primary purpose." *See* Pub. L. 89-669 § 1(b), 80 Stat. 926 (1966); *Hill*, 437 U.S. at 181 & n.26. The final version of the statute "carefully omitted [those] reservations," *id.* at 182, and replaced them with the universal terms of section 7. The "pointed omission" of such qualifications amounted to an "explicit congressional decision to require agencies to afford *first priority* to the declared national policy of saving endangered species." *Id.* at 185 (emphasis added); *see also id.* at 174 ("Congress intended endangered species to be afforded the highest of priorities.") (quoted in *Wash. Toxics Coalition v. EPA*, No. 04-35138, 2005 WL 1523669, at *5 (9th Cir., June 29, 2005)).

Another aspect of the statute's structure and history, not directly at issue in *Hill*, bolsters the conclusion that section 7 includes an affirmative grant of authority to attend to protection of listed species within agencies' authority when they take actions covered by section 7(a)(2). Section 7(a)(1) of the Endangered Species Act directs agencies to "utilize their authorities in furtherance of the purposes of this chapter by

carrying out programs for the conservation of [listed] species." 16 U.S.C. § 1536(a)91). Section 7(a)(2), in contrast, does not refer to agencies' existing "authorities," but instead directs agencies that, when considering covered "actions," they are to proceed in a manner not likely to jeopardize listed species.

The House Report indicates that this distinction between the two sections was, as one would expect, deliberate. The Report noted the requirement of present section 7(a)(2) as imposing a "*further* require[ment]" beyond that of section 7(a)(1).[15] *See* H.R. Rep.No. 93-412, at 14 (1973), *reprinted in* 1 CONGRESSIONAL RESEARCH SERVICE, A LEGISLATIVE HISTORY OF THE ENDANGERED SPECIES ACT OF 1973, AS AMENDED IN 1976, 1977, 1978, 1979, AND 1980, at 153 (1982) [hereinafter LEGISLATIVE HISTORY] (emphasis added). The contrasting language of the two sections indicates that the "further requirement" imposed by section 7(a)(2) turns on the distinction between using *existing* authority to promote conservation of species and conferring an *additional*, do-no-harm obligation — and reciprocal authority — applicable when the agency's *own* actions could cause harm to endangered species.

That Congress so provided is confirmed by Representative Dingell's statement concerning the final bill, relied upon by the Supreme Court as an authoritative statement of section 7's intent:[16] " '[T]he agencies of Government can no longer plead that they can do nothing about [harm to threatened or endangered species]. *They can, and they must. The law is clear.*' "

---

[15]This history is consistent with the "canon of statutory interpretation which holds that terms of the same statute are not to be construed so as to be redundant." *Agredano v. Mutual of Omaha Cos.*, 75 F.3d 541, 544 (9th Cir. 1996).

[16]Representative Dingell was the House manager of the Endangered Species Act. *Hill*, 437 U.S. at 183.

*Hill*, 437 U.S. at 184 (quoting 119 Cong. Rec. 42913 (1973), emphasis in *Hill*).[17]

After the Supreme Court decided *Hill* in 1978, Congress amended the Endangered Species Act, creating a narrow exception to section 7's requirements. *See* Pub. L. No. 95-632, 92 Stat. 3751 (1978). The 1978 amendment did not change section 7's substantive provisions. Instead, Congress created a process by which agencies could apply to an "Endangered Species Committee" for exemptions, § 1536(g), and specified standards by which to judge such applications, § 1536(h). The Senate Report described this exemption as a direct response to *Hill*, stating that *Hill* represented "the type of Federal action which should be eligible for review" for a section 7(g) exemption. S. Rep. No. 95-874, at 2 (1978), *reprinted in* 3 LEGISLATIVE HISTORY, at 940.

---

[17]Another portion of Dingell's same statement was quoted in an earlier case of this court, *County of Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081 (9th Cir. 2003), to support the proposition that "[t]here is authority that the [Endangered Species Act] does not grant powers to federal agencies they do not otherwise have." *Id.* at 1085 (citing *Hill*, 437 U.S. at 183). The portion of Dingell's statement quoted in *Okanogan* was also quoted in *Hill*, but it is not the Supreme Court's own language. Much more of Dingell's same statement, including the language we quote in the text, appears as well in *Hill*.

To say that "there is authority" regarding a proposition is not to state a holding of this court. There is, as we judges are well aware in our daily work, often conflicting "authority" for any proposition. *Okanogan* had no need to survey, as we do today, all the relevant authority, as it went on to decide the case before it on independent grounds. Because the *Okanogan* panel rested its opinion on other points, it did not decide the question now before us.

**Volume 2 of 2**

The limited exemption created by the 1978 amendments and contained in sections 7(g) and (h) has no direct application here, as the EPA did not apply for it. Its terms, however, serve to confirm that the interpretation of the "insure" requirement in *Hill* remains controlling.

Sections 7(g) and (h) focus on practical concerns, not legal constraints on agency power to protect species. To obtain an exemption, an agency must show that "there are no reasonable and prudent alternatives to the agency action," the benefits of the action "clearly outweigh the benefits of alternative course of action consistent with conserving the species or its critical habitat, and such action is in the public interest," and the action has regional or national significance. § 1536(h)(1)(A)(i)-(iii). Critically, no section 7(g) exemption may be granted until *after* consultation is completed. § 1536(g)(1); 50 C.F.R. § 402.15(c). Thus, at the time consultation occurs, all parties must operate under the assumption that all of section 7(a)(2)'s substantive requirements apply to the action agency. The net effect of the section 7(g) and (h) exemption, then, is to leave the consultation requirement in effect as it was previously; to leave in place the kinds of "agency actions" to which the section 7(a)(2) requirement applies; but to provide a set of procedures and substantive standards for limiting in some circumstances the mandate that agencies "insure" that their actions are not likely to jeopardize listed species.

That the 1978 amendments reiterated rather than retreated from *Hill*'s underlying understanding of the Endangered Species Act is confirmed by the history of those amendments. The House Report summarized Congress's understanding of *Hill's* conclusion that "[t]he pointed omission of any type of qualifying language in the statute revealed congressional intent to give the *continued existence of endangered species priority over the primary missions of federal agencies*." H.R. Rep. No. 95-1625, 10 (1978), *reprinted in* 2 LEGISLATIVE

HISTORY, at 734 (emphasis added). Congress did nothing to alter this conclusion. Instead, in enacting the 1978 amendments, Congress once again refused to adopt an amendment that would have limited section 7 compliance to situations when compliance is "practicable and consistent with [agencies'] primary responsibilities." S. Rep. No. 95-874, at 58-59 (1978), 3 LEGISLATIVE HISTORY at 996-97. Congress's rejection of this amendment underlines its continued understanding, consistent with *Hill*, that section 7(a)(2) specifies that agencies must *when acting affirmatively* refrain from jeopardizing listed species, even if the agency's governing statute does not so provide. The only exception to this rule lies in a section 7(g) exemption.

**[17]** We conclude that the obligation of each agency to "insure" that its covered actions are not likely to jeopardize listed species is an obligation in addition to those created by the agencies' own governing statute. The next question we must decide is whether the EPA's transfer decision is the kind of agency action to which that obligation applies.

### 3. Actions "authorized, funded, or carried out" by an agency

As we interpret section 7(a)(2) in light of the case law, the Endangered Species Act confers authority and responsibility on agencies to protect listed species when the agency engages in an affirmative action that is both within its decisionmaking authority and unconstrained by earlier agency commitments. The decision to approve a state's pollution permitting transfer application meets these criteria and is thus the sort of decision to which section 7(a)(2) applies. The Biological Opinion's reasoning that the EPA had no choice but to disregard the impact of the transfer on listed species in Arizona was therefore inconsistent with the statute.

Section 7(a)(2) applies to all agency actions "authorized, funded, or carried out" by the agency in question. This lan-

guage does indicate that some agency actions are not covered — those the agency does *not* "authorize[ ], fund[ ], or carr[y] out." Our determination as to whether the transfer decision is covered thus depends on the meaning of those terms.[18]

**[18]** The regulatory provision that delineates the actions covered by section 7(a)(2) reads: "Section 7 and the requirements of this Part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. Although there is no statutory reference to "discretionary involvement or control," there is the limitation, just noted, to actions "authorized, funded, or carried out" by the agency. As that limiting language is the only possible source for the regulation's "discretionary" qualification of "all actions," we take the regulation as a gloss on what the statutory limitation means and interpret the term "discretionary" accordingly.

Arizona and the Chamber note that the Clean Water Act specifies that the EPA "shall approve" state applications that meet certain enumerated factors. 33 U.S.C. § 1342(b). They argue that this language precludes EPA "discretion" to act on behalf of listed species, and that, applying 50 C.F.R. § 402.03, section 7 does not apply. However, "an agency cannot escape its obligation to comply with the [Endangered Species Act] merely because it is bound to comply with another statute that has consistent, complementary objectives." *Wash. Toxics*, 2005 WL 1523669, at *5. Applying this principle, we reject, for two reasons, Arizona and the Chamber's argument that § 1342(b) of the Clean Water Act eliminates any obligation to follow section 7(a)(2) of the Endangered Species Act.

---

[18]Because we conclude that approving Arizona's application is an "authorizing" action, and because no party argued that the EPA's use of some other authority — such as its grant-making authority, *see* 33 U.S.C. § 1256, which helped Arizona implement the pollution permitting program — we do not decide whether any action besides the transfer decision triggered section 7(a)(2).

*First*, the EPA makes no argument that its transfer decision was not a "discretionary" one within the meaning of 50 C.F.R. § 402.03. Indeed, it could not so argue for, as we have seen, the agency recognizes that it had a duty to consult, a duty the regulations would preclude if the federal involvement in or control of the transfer decision was not sufficiently "discretionary." We may not affirm the EPA's transfer decision on grounds not relied upon by the agency. *See Chenery I*, 318 U.S. at 87; *see also Gifford Pinchot Task Force*, 378 F.3d at 1072 n.9. Further, we ordinarily defer to an agency's interpretation of its own regulation. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001). As the EPA evidently does not regard § 402.03 as excluding the transfer decision, we should not so interpret the regulations.

*Second*, cases applying § 402.03 are consistent with our understanding that the regulation's reference to "discretionary . . . involvement" is congruent with the statutory reference to actions "authorized, funded, or carried out" by the agency. Put another way, imposing section 7(a)(2)'s substantive requirements in those cases would have gone beyond the limited command of the statute.

Our § 402.03 "discretionary . . . involvement or control" cases hold section 7(a)(2) inapplicable if the agency in question had "no ongoing regulatory authority" and thus was not an entity responsible for decisionmaking with respect to the particular action in question. *Wash. Toxics*, 2005 WL 1523669, at *5. For example, we have relied on the "discretionary . . . involvement" regulation to find section 7(a)(2) inapplicable where the agency lacked any decisionmaking authority over the action of the kind challenged. *See Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004) (holding that the action at issue fell outside the agency's authority because the risk of harm to listed species arose from the President's decision regarding the Navy's nuclear submarine force, not the Navy's obedience to that order); *see also Marbled Murrelet v. Bab-*

*bitt*, 83 F.3d 1068, 1074 (9th Cir. 1996) (holding section 7(a)(2) inapplicable where a different agency made the ultimate decisions, while the respondent agency "merely provided advice," without authorizing, funding or carrying out anything). Other cases have found section 7(a)(2) inapplicable where the challenged action was legally foreordained by an earlier decision, such as where the agency lacked the ability to amend an already-issued permit "to address the needs of endangered or threatened species." *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001) (cited in *Wash. Toxics*, 2005 WL 1523669, at *5) (applying § 402.16, which has similar language to § 402.03); *see also Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995) (cited in *Wash. Toxics*, 2005 WL 1523669, at *5) (holding that section 7(a)(2) did not apply because the agency had no "[ ]ability to influence" a project based on a right-of-way granted prior to the Endangered Species Act's enactment).

In contrast, we have held that section 7(a)(2) does apply where the agency in question had continuing decisionmaking authority over the challenged action. *See Wash. Toxics*, 2005 WL 1523669, at *5 (holding that section 7(a)(2) applies to the EPA's registration of pesticides because of its "ongoing discretion to register pesticides, alter pesticide registrations, and cancel pesticide registrations"); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969 (9th Cir. 2003) (holding that section 7(a)(2) applies to the granting of permits — a quintessential "authorizing" action — for future fishing); *see also Sierra Club*, 65 F.3d at 1508 (citing *O'Neill v. United States*, 50 F.3d 677, 680-81 (9th Cir. 1995), and noting that section 7 applies to already-approved projects "if the project's implementation depended on an additional agency action"); *Envtl. Prot. Info. Ctr.*, 255 F.3d at 1082 ; *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125-26 (9th Cir. 1998) (holding that section 7(a)(2) applies to "renewal of water contracts" because the agency had power to set the terms of — that is, to "authorize" — the renewed contracts, and was not bound to reaffirm merely the previously-

negotiated terms); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994) (holding that section 7(a)(2) did apply when there was "ongoing agency action" in that the agency retained power to authorize and carry out land use decisions).

[19] In sum, we understand our cases applying the "discretionary . . . involvement" regulation to interpret that regulation to be coterminous with the statutory phrase limiting section 7(a)(2)'s application to those cases "authorized, funded, or carried out" by a federal agency. Where a challenged action has not been "authorized, funded, or carried out" by the defendant agency, we have held that section 7(a)(2) does not apply. Where the challenged action comes within the agency's decisionmaking authority and remains so, it falls within section 7(a)(2)'s scope.[19]

---

[19]The dissent concludes that because the Clean Water Act requires the EPA to consider a list of nine requirements when evaluating a state's pollution permitting transfer application, the EPA had no discretion to reject Arizona's application on Endangered Species Act grounds. The EPA has repeatedly taken the position that the question whether the EPA has sufficient discretion, applying 50 C.F.R. § 402.03, under the Endangered Species Act is not before us and has twice asked us to remand any question concerning such discretion. *See* EPA CR 28(j) letter of July 27, 2005 ("EPA did consult. The only issue before this Court is the adequacy of that consultation. For the same reason, the Court should not reach the question regarding whether the EPA has sufficient discretion to trigger consultation regarding the approval of the transfer of 402 permitting authority to the State."); EPA CR 28(j) letter of Aug. 4, 2005 ("Respondents again emphasize that the issue of whether or not the [EPA] can properly rely on 50 C.F.R. § 402.03 in deciding whether or not it must consult regarding its approval of the State of Arizona's Clean Water Act 402 Permitting Program is not before the Court in this case because EPA did consult regarding the approval of the program."). As noted in Part III.B, *supra*, the EPA has taken contradictory positions regarding its section 7(a)(2) obligations. The dissent does not explain its disagreement with that portion of our opinion.

The dissent argues that we should nonetheless affirm the EPA's action based on § 402.03 because the question is one of statutory interpretation.

**[20]** Like the agencies in *Washington Toxics*, *Pacific Rivers* and *Houston* but not the other § 402.03 cases noted above, the EPA had exclusive decisionmaking authority over Arizona's pollution permitting transfer application. The EPA's decision authorized the transfer, thus triggering section 7(a)(2)'s consultation and action requirements.

### 4. Other Circuits

Although *Washington Toxics* and the cases are fully consistent with our analysis, this case is the first in which we have specifically addressed the question whether section 7(a)(2) of the Endangered Species Act provides a modicum of additional authority to agencies, beyond that conferred by their governing statutes, to protect listed species from the impact of affirmative federal actions. Other circuits, however, have considered the question. The reasoning of those opinions reflects an existing intercircuit conflict on the question before us, with two circuits reading section 7(a)(2) as we do and two concluding that section 7 does not itself authorize agencies to protect listed species even when it is their own action that is jeopardizing then. *Compare Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294, 1299 (8th Cir. 1989), *and Conservation Law Found. v. Andrus*, 623 F.2d 712, 715 (1st Cir. 1979) *with Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 294, 298-99 (5th Cir. 1998), *and Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 34 (D.C. Cir. 1992). We do not find the D.C. Circuit and Fifth

But that is simply not so; § 402.03 is a regulation, *not* a statute. The dissent offers no analysis of the key *statutory* provision, section 7(a)(2) of the Endangered Species Act, nor does it offer any response to our interpretation of the plain language, intent and history of that section. Although the dissent does offer an interpretation of the Clean Water Act, that interpretation only matters if we are wrong about section 7(a)(2) of the Endangered Species Act and the EPA was wrong under 50 C.F.R. § 402.03 in consulting about the transfer of permitting authority.

Circuit cases persuasive, as they do not reflect a full consideration of the text and history of section 7(a)(2).

The First Circuit, writing a year after the Supreme Court decided *Hill*, noted that the Endangered Species Act "will continue to apply of its own force to major actions taken by the [agency]," regardless of the contents of the specific statute under which the agency acted. *Conservation Law Found., 623 F.2d at 715.* Thus, although the governing statute in that case may have contained standards "less stringent than those of the [Endangered Species Act]" with regard to the protection of listed species, "[t]he [Endangered Species Act] by its terms applies to all action by the Secretary." *Id.* Consequently, "[i]f [the secretary] cannot . . . insure that exploration will not jeopardize the continued existence of [listed species], he will not approve exploration plans." *Id.*

A decade later, the Eighth Circuit echoed *Conservation Law Foundation*, writing that "[e]ven though a federal agency may be acting under a different statute, that agency must still comply with the [Endangered Species Act]." *Defenders of Wildlife*, 882 F.2d at 1299; John W. Steiger, *The Consultation Provision of Section 7(a)(2) of the Endangered Species Act and Its Application to Delegable Federal Programs*, 21 ECOLOGY L.Q. 243, 274 (1994) (describing as "well established" the proposition that "section 7(a)(2) provides an independent source of authority that is in addition to the authority the Agency is granted in its programmatic statutes").

The D.C. Circuit has indicated that the Endangered Species Act does not empower an agency to impose conditions on an interim, annual license that, unlike the pollution permitting transfer decisions at issue here, the agency was obliged to issue without any deliberation. In so concluding, the D.C. Circuit noted in passing the language of section 7(a)(2), but reasoned that section 7(a)(1) instructs agencies to "utilize their authorities," and that this *section 7(a)(1)* language "does not

*expand* the powers conferred on an agency by its enabling act." *Platte River*, 962 F.2d at 34 (emphasis in original).

*Platte River* did not recognize the obvious differences between section 7(a)(1) and 7(a)(2) in both language and purpose. The D.C. Circuit did not, for example, discuss at all the meaning of the term "insure" in section 7(a)(2), absent from section 7(a)(1). Nor did it notice the difference between affirmative agency attempts to protect listed species (section 7(a)(1)) and a do-no-harm directive pertaining to affirmative agency actions with likely adverse impact on listed species (section 7(a)(2)). Finally, the D.C. Circuit in *Platte River* did not mention the availability of exemptions from section 7(a)(2) under the 1978 amendments, or the repeated decision of Congress not to approve proposed amendments that would have limited the reach of section 7(a)(2) so as to accord with the D.C. Circuit's reading of the unamended statute. For all these reasons, we do not find *Platte River's* cursory consideration of the question persuasive.

The Fifth Circuit relied on *Platte River* to hold that section 7(a)(2) does not permit the EPA to require a state to consult with FWS before issuing a water pollution permit. *Am. Forest & Paper Ass'n*, 137 F.3d at 294, 298-99. While we do not pass on the precise question decided in *American Forest*, we do note that, aside from the deficiencies of *Platte River* on which the Fifth Circuit relied, *American Forest* rested on a fundamental misconception concerning section 7(a)(2): The Fifth Circuit stated that it is "largely beside the point" whether the EPA's transfer decision is an "agency action," because "[e]ven if EPA were required to consult with the agencies . . . EPA lacks authority to" require states to protect listed species. *Id.* at 298 n.6. Section 7(a)(2), however, specifies that *if* an agency is contemplating a covered "agency action," it has an obligation *both* to consult and to "insure" against taking action likely to jeopardize species. The Fifth Circuit's notion that the consultation and assurance aspects of the statute are independent is simply incorrect.

In sum, the better reasoned out-of-circuit authority, as well as our own precedent, supports our conclusion that section 7(a)(2) independently empowers EPA to make pollution permitting transfer decisions on behalf of listed species and their habitat when undertaking covered actions.

## 5. *Summary*

We hold that approving Arizona's pollution permitting transfer application was an agency action "authorized" by the EPA, thus triggering both section 7(a)(2)'s consultation requirement and its mandate that agencies not affirmatively take actions that are likely to jeopardize listed species. The EPA may have complied with its obligations under the Clean Water Act, but compliance with a "complementary" statute cannot relieve the EPA of its independent obligations under section 7(a)(2). *See Wash. Toxics*, 2005 WL 1523669, at *5. Section 7(a)(2) imposes a duty on the EPA to "insure" its transfer decision is not likely to jeopardize protected species or adversely modify their habitat, and this duty exists alongside Clean Water Act provisions as the agency's "first priority." *Hill*, 437 U.S. at 185.

[21] We therefore conclude that, under *Public Citizen*, the EPA's transfer decision will cause whatever harm may flow from the loss of section 7 consultation on the many projects subject to a water pollution permit, and that harm constitutes an indirect effect of the transfer.[20] The Biological Opinion, which ignored this effect while recognizing that section 7

---

[20]Defenders also challenge the Biological Opinion and the EPA for failing to analyze the "cumulative effects" of the pollution permitting transfer, as required by Endangered Species Act regulations. *See* 50 C.F.R. § 402.14(g)(3) (requiring consideration of "cumulative effects"); § 402.02 (defining "cumulative effects"). As we consider the loss of section 7 consultation benefits on future permits an "indirect effect" of the EPA's transfer decision, we need not consider Defenders' argument that the EPA and Biological Opinion should have also considered that effect as part of a "cumulative effect."

consultations concerning pollution permitting permits have saved species' critical habitat in the past, was therefore deficient. The EPA erred by relying on this fatally deficient Biological Opinion.

## D. Other bases for the EPA's transfer decision

Having concluded that the Biological Opinion upon which the EPA relied was flawed in its basic legal premise,[21] we now consider whether that Opinion's other analyses, or any analysis outside the Biological Opinion that the EPA relied upon, saves the validity of the EPA's transfer decision.

### 1. No "detailed discussion" of effects on all listed species

Consistent with its underlying legal analysis, the Biological Opinion never considered in any detail the likely real-world impact of the transfer decision on listed species in Arizona. The failure to conduct that inquiry fatally infects the Opinion's truncated alternative causation analysis.

50 C.F.R. § 402.14(h)(2) requires a biological opinion to include a "detailed discussion of the effects of the action on listed species or critical habitat." The Biological Opinion on which the EPA relies does not do so. Instead, it refers to a website summarizing listed species' *status*, but includes no discussion of how the pollution permitting transfer might affect any particular species. The Biological Opinion concludes that the transfer will not likely jeopardize *any* species — but only because, once again, "it is not the proposed action itself that is jeopardizing these species."

Defending the Biological Opinion, the Home Builders argue that the "effects of the action" — which the Biological Opinion must consider under 50 C.F.R. § 402.14(h) — exclude the impact of Arizona water pollution permits on ter-

---

[21]*See supra*, Parts III(B)-(C).

restrial species.[22] Neither the Biological Opinion nor the EPA, however, used this argument to support the agency action. We may not affirm the EPA's transfer decision on grounds not relied upon by the agency. *See Chenery I*, 318 U.S. at 87; *see also Gifford Pinchot Task Force*, 378 F.3d at 1072 n.9. Accordingly, we need not decide the merits of the Home Builders' argument.

It is understandable that EPA has not embraced the Home Builders' analysis. According to the Home Builders, the section 7 consultations and EPA-requested mitigation undertaken in the past regarding *federal* pollution permits were improper, because the EPA took into account as indirect effects the long-run impact of development on terrestrial upland species. This argument is based on a flawed reading of Endangered Species Act regulations.

A Biological Opinion must discuss the effects of an agency action, § 402.14(h), including the action's direct effects, indirect effects, and "effects of other activities that are interrelated or interdependent with that action," meaning those actions "that are a part of a larger action and depend on the larger action." § 402.02. If a construction project cannot go forward without a water pollution permit, then the entire project is "interrelated or interdependent" with the proposed discharge and must be considered in a Biological Opinion.

The Home Builders cite a different regulation, requiring a

---

[22]The record indicates that a large portion of permits issued by ADEQ — up to 20,000 permits annually — will be for "stormwater construction [discharges]." This reference is to storm water that flows over a construction site, picking up various pollutants and carrying them across terrestrial and eventually into aquatic habitat. *Stormwater Discharges from Construction Activities,* EPA-NPDES, *at* http://cfpub1.epa.gov/npdes/stormwater/const.cfm?program_id=6 (last visited July 5, 2005). Such permits relate to the construction itself, not to a discrete discharge during construction. As a practical matter, a developer could not perform any construction activities without such a permit.

more limited analysis. *See* § 402.12(c), (d)(2) (describing requirements of a biological assessment to include only discussion of effects on listed species and habitat in the "action area"). But that limited analysis applies to what an action agency must do *before* formal section 7 consultation begins, and does not excuse agencies from other section 7 requirements that consultation may trigger.

The Home Builders also cite cases relating to portions of development projects that "could exist independently of each other." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116 (9th Cir. 2000). Seemingly, the Home Builders argue that, because section 7 does not require consultation or mitigation with regard to a development project truly independent of the one covered by a permit, section 7 also does not cover development projects that *are* dependent on the permit in question. On the contrary, section 7 covers development projects "interrelated or interdependent with" the discharge permitted by a permit, and therefore covers in many instances the development that will take place if construction-connected stormwater discharge is permitted.

Neither the FWS nor the EPA makes any argument that justifies the Biological Opinion's failure to analyze, in detail, the likely effect of such future development projects fostered by pollution permits on specific species. This failure is especially telling in light of the benefits of section 7 consultation regarding water pollution permits. That consultation, as the Biological Opinion noted, has led various developers to alter their development plans, preserving thousands of acres of listed species' habitat. For example, such mitigation has "maintain[ed] dispersal and movement corridors" for the pygmy owl. FWS staff had noted that the absence of section 7 consultation could harm specific species, yet the Biological Opinion did not spell out those concerns in any detail.

By not considering the transfer's specific impact on listed species — at least those as to which specific concerns had

been expressed — the Biological Opinion "failed to consider an important aspect" of the transfer decision. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 2.   *Alternatives to section 7 consultation*

The Biological Opinion notes state and federal endangered species protections that exist without section 7 consultation, including: (1) the Memorandum of Agreement between the EPA and FWS, EPA oversight over ADEQ; (2) the Endangered Species Act's anti-take provisions; and (3) Arizona state law. The EPA relies on these protections as sufficient to assure against jeopardizing listed species. None of these protections, however, are sufficient substitutes for section 7's consultation and mitigation mandates.

### a. Memorandum of Agreement

The Memorandum of Agreement provides the closest substitute for the provisions of section 7. It cannot, however, replace section 7, because it does not grant the federal government any authority to require Arizona to engage in the kind of consultation and mitigation measures EPA had conducted before the transfer.

Under the Memorandum, the EPA will review ADEQ permits and identify those that "may raise issues regarding" listed species. 66 Fed. Reg. 11,202, 11,216 (Feb. 22, 2001). For projects posing a significant threat to listed species, the FWS "will work with the State . . . to reduce the detrimental effects stemming from the permit." *Id.* The FWS, however, has no statutory authority to mandate that the state revise any problematic permits, nor does the EPA. In contrast, all federal agencies have a duty, in consultation with the FWS, to ensure that their actions are not likely to jeopardize any listed species or their designated habitat. § 1536(a)(2).

The Memorandum also provides that the "EPA will use the full extent of its CWA [Clean Water Act] authority to object to a State . . . permit where EPA finds . . . that a State . . . permit is likely to jeopardize" listed species. 66 Fed. Reg. at 11,216. However, the Clean Water Act does not grant the EPA authority to make pollution permitting transfer decisions for the benefit of all endangered species; the EPA has that authority only when one also considers the Endangered Species Act.[23] As a result, Endangered Species Act concerns raised by a permit are cognizable under the Clean Water Act only fortuitously, if at all. Unless the EPA is willing to use the authority granted by section 7 in addition to that accorded by the Clean Water Act, the EPA's ability to object to permits and thereby conserve listed species will be quite limited.

In sum, the Memorandum calls for the EPA and the FWS to *discuss* listed species matters with ADEQ, but relies on ADEQ *voluntarily* to cooperate with those federal agencies. We assume that ADEQ will consider any listed species issues raised in good faith. Nothing in the record, however, indicates that ADEQ even has authority under state law to *require* permit applicants to protect listed species. Section 7 thus provides protection for species that reliance on purely voluntary action by the state cannot supply.

### b. EPA oversight

For similar reasons, EPA oversight under 33 U.S.C. § 1342(c) provides a weak substitute for section 7 consultation. Such oversight relates to different substantive standards

---

[23]Pollution permitting standards that apply to both federal permits, 33 U.S.C. § 1342(a), and state permits, § 1342(b)(1)(A), incorporate concerns for the effect of pollutants on *aquatic* species living in waterways affected by water pollution. *See, e.g.,* 33 U.S.C. § 1317(a)(1) (listing effect of toxic pollutants on "affected organisms in any waters" as a factor to consider in issuing permit). These powers do not extend to terrestrial species, nor do they include section 7(a)(2)'s *prohibition* on agency actions that are likely to jeopardize listed species.

— those of the Clean Water Act, rather than the Endangered Species Act. The Clean Water Act standards governing permitting decisions will not directly relate to protection of most — if any — listed species, and so cannot substitute for section 7 coverage.

### c. Endangered Species Act anti-take provisions

The Endangered Species Act makes it a crime to "take" any species listed as endangered, defining "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1538(a); 16 U.S.C. § 1532(19). The Supreme Court has upheld regulations that define "take" to include any act "which actually kills or injures wildlife," where such acts may include "significant . . . modification or degradation" of listed species' habitat.[24] *See Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*, 515 U.S. 687, 691 (1995) (upholding 50 C.F.R. § 17.3). Section 10 of the Endangered Species Act creates an "incidental take" permit program pursuant to which the Secretary of Interior may grant permits for activity — such as some construction projects — that may incidentally "take" an endangered species specimen, so long as the permittee sufficiently mitigates the risk of a take. *See* 16 U.S.C. § 1539. These anti-take provisions apply to all actors, not only the federal government. § 1538(a)(1). Accordingly, private developers are subject to sections 9 and 10 regardless of whether the EPA or a state government issues the developers' water pollution permits.

Sections 9 and 10 are important provisions, but they are not substitutes for section 7 coverage. Section 7 covers *any* fed-

---

[24]The regulation defines "[h]arm in the definition of 'take' in the Act [as] an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

eral agency action that could *threaten* species or their critical habitat. While the anti-take provisions prohibit "[e]liminating a threatened species' habitat," *Envtl. Prot. Info. Ctr.*, 255 F.3d at 1075, or "significant . . . modification or degradation where it actually kills or injures wildlife," 50 C.F.R. § 17.3, the effectiveness of these prohibitions depends on their enforcement by the appropriate authorities. "[T]he Government cannot enforce the § 9 prohibition until an animal has actually been killed or injured." *Sweet Home*, 515 U.S. at 703. Accordingly, after-the-fact enforcement cannot prevent threats to listed species the way section 7 can. Prevention of takings may come from the section 10 permitting process, but private parties *choose* whether to pursue a section 10 incidental take permit. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 927 (9th Cir. 2000). Private parties only have an incentive to do so if there is a meaningful threat of section 9 enforcement.

On this record, there is no indication that section 9 is or will be enforced meaningfully enough to provide a sufficient substitute for section 7. The record reflects no instances in which FWS has initiated a section 9 enforcement action with regard to listed species in Arizona. Additionally, FWS staff stated in the Interagency Elevation Document that they did "not believe that section 9 enforcement is an acceptable substitute for section 7 consultation." This opinion reflected staff concerns, expressed in internal emails, that section 9 is ill-suited to protect species such as the pygmy owl, whose numbers are so low that section 9 enforcement may come too late to prevent extinction. The Biological Opinion contains no indication the FWS will increase section 9 enforcement nor any other analysis alleviating FWS staff concerns. The absence of record evidence of section 9 enforcement is confirmed by our own research, which reveals public notices regarding only two applications for incidental take permits for projects occurring in Arizona since January 1, 2001. *See* 69 Fed. Reg. 75,556 (Dec. 17, 2004); 69 Fed. Reg. 15,362 (Mar. 25, 2004). Compared to the large number of construction projects in the state, this low number suggests that developers

do not feel that section 9 enforcement is sufficiently likely for them to apply for section 10 permits.

### d. Arizona state law

The Biological Opinion notes one Arizona law that prohibits the taking of "native plants" — which, the Opinion notes, includes endangered or threatened plants — from any land within the state without following certain procedures. *See* Ariz. Rev. Stat. § 3-904. The Opinion implies that this law partially fills a gap left open by the Endangered Species Act, which limits the taking of endangered plants on federal land only, not all land. *See* 16 U.S.C. § 1538(a)(2)(B).

The Arizona statute, however, is not an adequate substitute for section 7(a)(2)'s limitation on granting permits that could jeopardize listed species. As the Biological Opinion notes, the Arizona statute merely requires private landowners to notify a state agency of plans to destroy certain plants on their property and regulates when that destruction may take place. *See* Ariz. Rev. Stat. § 3-904. It does not prohibit such destruction, or set standards to be taken into account in the issuance of water pollution permits. The Biological Opinion does not discuss the standards that govern Arizona's regulation of native plant takes, and does not indicate that Arizona considers the listed status of plants for federal purposes in granting native plant take permits.

In sum, the Biological Opinion fails to provide a reasoned explanation concerning why Arizona's native plant law adequately substitutes for section 7, even for plants. As it obviously does not do so for animals, § 3-904 is no substitute for section 7(a)(2) of the Endangered Species Act.

### 3. The EPA's reliance on the Biological Opinion

The EPA had an independent duty under section 7(a)(2) to ensure that its pollution permitting transfer decision was not

likely to jeopardize listed species or adversely modify their habitat. Arbitrarily and capriciously relying on a faulty Biological Opinion violates this duty. *Res. Ltd.*, 35 F.3d at 1304; *Pyramid Lake*, 898 F.2d at 1415.

When considering challenges to agency actions based on *factual* objections to the Biological Opinion, however, we have held that an agency can satisfy the arbitrary and capricious standard of review even if it relies on an "admittedly weak" Biological Opinion, if there is no "information the Service did not take into account which challenges the [biological] opinion's conclusions." *Id.*; *see also Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984). This holding is based on the notion that action agencies should be able to rely on the expert judgments that underlie most Biological Opinions. *See id.* (twice noting reasonableness of action agency's reliance on "the *expert* agency") (emphasis added). Here, however, the Biological Opinion's flaws are *legal* in nature. Discerning them requires no technical or scientific expertise. The EPA should have understood the legal errors of the Biological Opinion's analysis. Its failure to do so led to an action based on reasoning "not in accordance with law" and is thus arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

Even applying the *Pyramid Lake* standard, the EPA acted arbitrarily and capriciously. Information not considered by the Biological Opinion that challenges its conclusion includes FWS staff members' articulated, specific concerns about the impact of the loss of section 7 consultation, supported by information regarding the effect of past section 7 consultations.

The EPA notes that it relied on two pieces of evidence supporting its conclusion *beyond* that contained in the Biological Opinion and argues that consideration of this evidence pro-

vided the reasoned consideration that the arbitrary and capricious standard requires.[25]

The first such evidence is the EPA's own Biological Evaluation. This report focused largely on Clean Water Act requirements and devoted only a few pages to endangered species. The report summarizes the EPA-FWS Memorandum of Agreement, Endangered Species Act anti-take provisions, EPA oversight of ADEQ's permit program, and Arizona's native plant laws, without addressing their limitations, discussed above. The report's "Discussion of Effects" notes the loss of section 7 consultation, but otherwise focuses on Clean Water Act compliance and repeats the protections afforded by other programs. It does not discuss the impact on listed species of the loss of section 7 consultation and mitigation and so adds nothing to the Biological Opinion.

The second piece of evidence on which the EPA relies is an "assurance[ ] from the Arizona Game and Fish Department . . . that Federally-listed species would not suffer" from the lack of section 7 consultations. This document is from an Arizona official of a state department that is *not* the one that will issue Clean Water Act permits. He writes that the EPA-FWS Memorandum of Agreement "will serve as a guideline for . . . Arizona to ensure that [pollution] permits will not negatively impact endangered and threatened species."

There is no indication that Arizona would be bound by this letter. The ADEQ, the agency primarily responsible for implementing Arizona's pollution permitting authority, has not subscribed to its assurances. Nor does the letter writer explain by what authority Arizona will "ensure that . . . permits will not negatively impact endangered and threatened species," or

---

[25]Any explanation for its decision based on facts or reasoning not in the Biological Opinion must, of course, satisfy the EPA's substantive obligations under section 7(a)(2) and the arbitrary and capricious standard of review discussed above.

indicate that his agency has any authority to do so, let alone authority as broad as the protections mandated by the Endangered Species Act as applied by the EPA.

In the abstract, voluntary compliance by state agencies willing to follow FWS recommendations to the same extent as would the EPA *might* substitute for section 7 coverage. The EPA, however, could not so conclude without first analyzing the likelihood that *all* relevant Arizona agencies can and would live up to the Game and Fish Department's promises, as well as considering the effectiveness of federal oversight if Arizona agencies fail to live up to any such promises.

**[22]** Given its serious faults, the independent evidence on which EPA relies cannot fill in the crucial gaps in the Biological Opinion. Neither the Biological Opinion nor the EPA, consequently, adequately considered indirect effects of the transfer. The EPA thus "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Because neither the Biological Opinion nor the EPA examined all relevant data, the EPA's transfer decision was arbitrary and capricious.

### 4. Summary

The EPA's most serious errors were (1) its failure to understand its own authority under section 7(a)(2) to act on behalf of listed species and their habitat and (2) its failure to discuss the specific effects of its decision on the various listed species present in Arizona. It is possible that some combination of state and federal protections for listed species and state agency cooperation with the federal Memorandum of Agreement might sufficiently replace the benefits of section 7 consultation so that no harm to listed species would be "reasonably certain to occur" as a result of losing section 7 consultation. 50 C.F.R. § 402.02. But the EPA could not so conclude without specifically analyzing each listed species within Arizona and without more certain assurances of volun-

tary state cooperation from officials at *all* relevant Arizona agencies, as well as a more careful consideration of the actual protection accorded by other federal and state statutory provisions and the Memorandum of Agreement.

## IV. Remedy

Typically, when an agency violates the Administrative Procedure Act and the Endangered Species Act, we vacate the agency's action and remand to the agency to act in compliance with its statutory obligations. In certain instances, however, "when equity demands, the [challenged action] can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

We have carefully considered whether equitable considerations warrant allowing Arizona to maintain its authority over pollution permitting decisions while the EPA "follows the necessary procedures," beginning with consultations with the FWS based on legal understandings consistent with this opinion. Arizona has undoubtedly expended significant funds to obtain and implement pollution permitting authority and granted a significant number of permits pursuant to this authority.[26] We cannot reverse the expenditure of those funds nor the issuance of those permits. We further recognize the administrative difficulties in transferring a program like pollution permitting from Arizona back to the EPA and very possibly back to Arizona again. Based on the desire of Arizona to keep its pollution permitting authority and the record of other states obtaining and maintaining their own pollution permitting

---

[26]For instance, one type of water pollution permit issued by Arizona under its pollution permitting authority, stormwater discharge permits, account for approximately 20,000 permit applications annually. ARIZ. DEP'T OF ENVT'L QUALITY, *ADEQ Director Steve Owens Unveils a Web-based System to Apply for Stormwater Discharge Permits*, *at* http://www.azdeq.gov/function/news/2003/june.html#609 (last visited July 5, 2005).

authority, even after full consultation regarding the transfer's effect on endangered and threatened species, *see supra* note 3, it seems likely that Arizona will again apply for pollution permitting authority. Finally, we note that all of the actors in this case — Arizona, the EPA, and FWS — operated in a somewhat murky legal environment. Faced with two circuit court cases suggesting that the EPA lacked authority to make pollution permitting transfer decisions based on Endangered Species Act concerns, "the extent of doubt whether the agency chose correctly" was not insignificant. *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002).

Other factors, however, weigh heavily in favor of vacating the EPA's approval of Arizona's transfer application. As noted above, Arizona annually issues tens of thousands of pollution permits pursuant to the EPA's action. *See supra* note 22. We have concluded that, absent section 7 coverage, we have no strong assurances that these permits will not allow development projects that are likely to jeopardize listed species or adversely modify their habitat. The purpose of the Endangered Species Act — to conserve endangered and threatened species rather than allow them to go extinct, *see* 16 U.S.C. § 1531 — renders the risk of harm to listed species too great. This is particularly true in this case, in which the record suggests that one species — the pygmy owl — numbers less than 100. Temporary harms while the agency "follow[ed] the necessary procedures," *Idaho Farm Bureau*, 58 F.3d at 1405, could lead to the permanent harm of extinction. *See id.* (noting "the potential extinction of an animal species" as a crucial factor to consider when determining whether a challenged agency action should be vacated). Our concern with the risk of extinction comports with our understanding of the Endangered Species Act's "institutionalized caution mandate." *Wash. Toxics*, 2005 WL 1523669, at *3 (quoting *Sierra Club*, 816 F.2d at 1389). Without greater assurances that harm to listed species would not occur, our "institutionalized caution" makes us unwilling on the present record to order any remedy

other than vacation of the EPA's approval of Arizona's transfer application.

**[23]** For the just-stated reasons, we vacate the EPA's decision to approve Arizona's pollution permitting application. Pursuant to 28 U.S.C. § 1631, we transfer Defenders' Endangered Species Act and Administrative Procedure Act suit challenging the validity of the Biological Opinion to the district court where it was originally filed for proceedings consistent with this opinion. The petition for review is GRANTED and REMANDED to the EPA for proceedings consistent with this opinion.

---

THOMPSON, Senior Circuit Judge, dissenting:

Because I disagree with the conclusion in Part III of the majority opinion that the EPA had the authority to consider the impact on endangered and threatened species in making its decision to transfer administration of the pollution permitting system to the State of Arizona, I respectfully dissent.

As the majority observes, the requirements of section 7 of the Endangered Species Act "apply to all [agency] actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. "Where there is no agency discretion to act, the [Endangered Species Act] does not apply." *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125-26 (9th Cir. 1998). We have previously held that an agency lacks the requisite discretion to act when the agency does not have the authority to take action on behalf of endangered or threatened species. *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of the Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004) (where agency lacks discretion, to require compliance with section 7 of the Endangered Species Act "would be an exercise in futility"); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003)

("[T]he discretionary control retained by the federal agency must have the ability to inure to the benefit of a protected species. If no discretion to act is retained, then consultation would be a meaningless exercise.") (internal citation omitted); *Sierra Club v. Babbit*, 65 F.3d 1502, 1509 (9th Cir. 1995) ("[W]here . . . the federal agency lacks the discretion to influence the . . . action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.").

The majority interprets the "discretionary involvement" language of 50 C.F.R. § 402.03 to be "coterminous with" all actions "authorized, funded, or carried out" by a federal agency. Stated differently, the majority now holds that *any* action which comes within a federal agency's decisionmaking authority falls within the scope of section 7(a)(2) of the Endangered Species Act. In my view, our cases do not take such an expansive view of the meaning of § 402.03. Rather, we have consistently recognized that an agency may have decisionmaking authority and yet not be empowered, either as an initial matter or in conjunction with some continuing authority, to act to protect endangered or threatened species. *See Marbled Murrelet v. Babbit*, 83 F.3d 1068, 1074-75 (9th Cir. 1996) (federal agency's decision to consult with and to provide advice to private entity was not discretionary agency action triggering section 7); *Sierra Club v. Babbit*, 65 F.3d at 1508-1510 (holding that although the Bureau of Land Management retained the right to object to a road development project in three specified circumstances, "the agency simply [did] not possess the ability to implement measures that inure to the benefit of the protected species."); *cf. Turtle Island Restoration Network*, 340 F.3d at 975 (concluding that Congress' decision to use the words " 'including but not limited to' " in the statute granting the Fisheries Service the authority to issue fishing permits "contemplated that the list of potential obligations that the United States had under the Agreement was not exhausted by those listed in the subsection").

Here, the EPA did not have discretion to deny transfer of the pollution permitting program to the State of Arizona; therefore its decision was not "agency action" within the meaning of section 7 of the Endangered Species Act.[1] The Clean Water Act, by its very terms, permits the EPA to consider only the nine specified factors. If a state's proposed permitting program meets the enumerated requirements, the EPA administrator "shall approve" the program. 33 U.S.C. § 1342(b). This Congressional directive does not permit the EPA to impose additional conditions. Although the majority quite properly concludes that a federal agency cannot escape its obligation to comply with section 7 of the Endangered Species Act when it is "bound to comply with another statute that has consistent, complementary objectives," *Wash. Toxics Coalition v. EPA*, ___ F.3d ___, slip op. 7721, 7738 (9th Cir. Jun. 29, 2005), here, the EPA has an obligation to evaluate the state's application against nine *exclusive* requirements. 33 U.S.C. § 1342(b); *see also Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998) ("The language of [§ 1342(b)] is firm: . . . 'Unless the Administrator of EPA

---

[1] The majority concludes that pursuant to *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (*Chenery I*), it may not deny the petition for review on this basis because the EPA did not contend that it lacked discretion to consult under section 7 in conjunction with the transfer of pollution permitting authority to Arizona. We have, however, previously declined to take such a broad view of *Chenery* and instead have observed that although "[g]enerally, a reviewing court may only judge the propriety of an agency's decision on the grounds invoked by the agency, . . . the court is not so bound when, as here, the issue in dispute is the interpretation of a federal statute." *Ry. Executives' Ass'n v. ICC*, 784 F.2d 959, 969 (9th Cir. 1986). The majority's conclusion further disregards our obligation to review an agency's statutory mandate de novo, *see Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1095 (9th Cir. 2005); *see also Am. Rivers v. FERC*, 201 F.3d 1186, 1194 (9th Cir. 2000) (noting that review of "substantive issues of statutory construction" "proceed[s] along [a] different analytic path[ ]" and is "subject to [a] separate standard[ ] of review" than review of an agency's compliance with procedural requirements), and, in doing so, to "give effect to the unambiguously expressed intent of Congress." *Chevron v. Nat'l Res. Defense Council*, 467 U.S. 837, 843 (1984).

determines that the proposed state program does not meet [the specified] requirements, he must approve the proposal.' ") (quoting *Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1285 (5th Cir. 1977)); *Nat'l Res. Defense Council v. EPA*, 859 F.2d 156, 173-74 (D.C. Cir. 1988) (observing that "[t]he [Clean Water Act] specifies prerequisites for state assumption of the program . . . and commands the Administrator to approve the state permit system once he determines that the statutory requirements and administrative guidelines are met."). To impose the additional requirement of consultation under section 7 would be inconsistent both with the EPA's statutory obligation to consider only the requirements enumerated in § 1342(b) and with the Clean Water Act's clearly expressed objectives. *See* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," and "that the States will manage . . . and implement" the NPDES pollution permitting program).

Nor, in my view, does the EPA possess the kind of continuing authority to monitor states' administration of their pollution permitting programs that would render its oversight discretionary. As the majority notes, the EPA's limited oversight under 33 U.S.C. § 1342(c) relates only to the substantive standards of the Clean Water Act and does not grant any additional continuing review authority that would permit meaningful section 7 consultation.

The EPA's authority to grant or to deny the State of Arizona's application to administer the pollution permitting program was nondiscretionary; I would deny the petition for review.