NATURAL RESOURCES DEFENSE
COUNCIL, INC., Plaintiff,

v.

FEDERAL HOUSING FINANCE
AGENCY, Edward DeMarco, Acting
Director, Federal Housing Finance
Authority, Office of the Comptroller
of the Currency, a component of the
United States Department of the Treasury, and John G. Walsh, Acting
Comptroller of the Currency, Defendants.

No. 10 Civ. 7647(SAS).

United States District Court,
S.D. New York.

June 17, 2011.

Joshua Aries Berman, Esq., Natural Resource Defense Council, Inc., Washington, DC, Katherine Kennedy, Esq., Mitchell S. Bernard, Esq., Natural Resources Defense Council, Inc., New York, NY, for Plaintiff.

Asim Varma, Esq., Howard Neil Cayne, Esq., Scott Michael Border, Esq., Arnold & Porter, Stephen E. Hart, Esq., Federal Housing Finance Agency, Washington, DC, for Defendants (Federal Housing Finance Agency and Edward DeMarco).

Bertrand Rolf Madsen, Assistant U.S. Attorney, U.S. Attorney's Office, Southern District of New York, New York, NY, for Defendants (Office of the Comptroller of the Currency and John G. Walsh).

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

The Natural Resources Defense Council ("NRDC") brings this suit against the Office of the Comptroller of the Currency and John G. Walsh, Acting Comptroller of the Currency (collectively "OCC"), and the Federal Housing Finance Agency and Edward DeMarco, Acting Director of the Federal Housing Finance Agency (collectively "FHFA"). The NRDC alleges that the OCC's issuance of a July 6, 2010 advisory bulletin ("Bulletin") and the FHFA's issuance of a July 6, 2010 statement ("Statement") violated the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA"). Specifically, the NRDC alleges that the Bulletin and the Statement had the immediate effect of halting the development of Property Assessed Clean Energy ("PACE") programs and preventing localities and states from moving forward with adoption or implementation of new PACE programs.

The OCC now moves to dismiss the case for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) claiming lack of constitutional standing as well as for failure to state a claim pursuant to Rule 12(b)(6) claiming the Bulletin does not amount to a "final agency action" subject to the Court's review.[1] Similarly, the FHFA moves to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction claiming that certain statutory provisions preclude the

---

1. Because I am granting the OCC's motion to dismiss under Rule 12(b)(1), I do not reach the question of whether the Bulletin is a "final agency action."

exercise of jurisdiction over the NRDC's claims and pursuant to Rule 12(b)(6) claiming that the NRDC is not in the "zone of interest" protected by the Housing and Economic Recovery Act ("HERA") and that the Statement does not amount to a "final agency action." [2]

## II. BACKGROUND

### A. The NRDC and the PACE Programs

The NRDC is a national, not-for-profit environmental advocacy group with its principal place of business in New York City.[3] The NRDC has more than 447,000 members nationwide, with more than 317,-000 living in jurisdictions that have enacted PACE-enabling legislation.[4] The NRDC supports PACE programs, which allow local governments to offer financing to commercial and residential property owners to fund the upfront costs of energy efficiency and on-site renewable energy projects, using the proceeds of municipal or special revenue bonds, government grants, or other funding sources that may be available.[5] In exchange for upfront financing, property owners who participate in a PACE program agree to an incremental increase on their property taxes over a period of up to twenty years but not to exceed the useful life of the financial im-

provements.[6] Twenty-three states (and the District of Columbia) have passed legislation authorizing PACE programs.[7] Often, PACE liens "run" with the property and the PACE lender "steps ahead" of the mortgage holder in the priority of its claim against the collateral.[8] Although subordination of existing mortgages is not inherent in PACE financing, in New York and many jurisdictions, the liens that result from PACE program loans have priority over mortgages, including preexisting first mortgages.[9] Because first lien status is critical to the success of PACE programs, eliminating the priority lien status would make PACE programs effectively impossible to finance through the capital markets.[10]

### B. The OCC

The OCC is a bureau of the Treasury Department and functions as the primary supervisor of federally-chartered national banks.[11] The OCC administers statutory provisions governing virtually every aspect of the national banking system.[12] Under various statutes, including the National Bank Act and the Federal Deposit Insurance Act ("FDIA"), the OCC is charged with assuring the "safety and soundness"

2. Because I am granting the FHFA's motion to dismiss under Rule 12(b)(1), I do not reach the questions of whether the NRDC is in the zone of interest protected by HERA or whether the Statement is a final agency action.

3. *See* NRDC Second Amended Complaint ("Compl.") ¶ 19.

4. *See* Plaintiff's Memorandum in Opposition to Defendants FHFA and OCC's Motion to Dismiss ("Opp. Mem.") at 5.

5. *See* Compl. ¶ 2.

6. *See id.* ¶ 3.

7. *See id.* ¶ 43.

8. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss ("FHFA Mem.") at 5.

9. *See id.*

10. *See* Compl. ¶ 48.

11. *See* Memorandum of Defendants Office of the Comptroller of the Currency and John G. Walsh in Support of Their Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) ("OCC Mem.") at 2.

12. *See id.*

of national banks.[13] Pursuant to the FDIA, the OCC has prescribed guidelines governing the banks' "credit underwriting." [14] The guidelines provide that banks are to establish and maintain "prudent credit underwriting practices" that consider the nature of the markets in which loans are made, and provide for consideration of "the nature and value of any underlying collateral." [15]

On July 6, 2010, the OCC posted a Bulletin on its website discussing the PACE programs and included as an attachment the FHFA's July 6 Statement.[16] The Bulletin was labeled "Supervisory Guidance" and stated that its purpose was to "alert national banks to concerns and regulatory expectations" regarding PACE programs.[17] The Bulletin stated that the PACE programs' "lien infringement raises significant safety and soundness concerns that mortgage lenders and investors must consider." [18] The Bulletin goes on to state that "National Bank lenders should take steps to mitigate exposures and protect collateral positions," and suggests examples of mitigating steps.[19] The Bulletin was issued without notice or opportunity for public comment and without any environmental review.[20]

## C. The FHFA and the Enterprises

The FHFA is an independent agency that supervises and regulates the financial safety and soundness of Fannie Mae and Freddie Mac (the "Enterprises") and the Federal Home Loan Banks.[21] Together, these government-sponsored enterprises provide more than $5.9 trillion in funding for U.S. mortgage markets and financial institutions.[22] The Enterprises facilitate the secondary market in residential mortgages and free up capital for additional mortgage lending by purchasing mortgages from mortgage lenders.[23]

In the wake of the subprime mortgage crisis, Congress passed HERA in July 2008.[24] HERA created the FHFA and enumerates the agency's powers as conservator.[25] Under HERA, those powers include "preserv[ing] and conserv[ing] the assets and property of the regulated entity" [26] and "tak[ing] such action as may be necessary to put the regulated entity in a sound and solvent condition." [27] Furthermore, section 4617(f) of HERA states that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator." [28]

In 2008, the FHFA placed the Enterprises into conservatorship pursuant to section 4617(a)(2).[29] Consequently, the

13. *See* 12 C.F.R. Part 30, app. A. ¶ II.D.

14. *See id.*

15. *See id.*

16. *See* Compl. ¶ 18. *See also* 7/6/10 OCC Bulletin ("Bulletin"), Ex. B to Compl.

17. *See* Bulletin at 1.

18. *See id.*

19. *See id.*

20. *See* Opp. Mem. at 9.

21. *See* FHFA Mem. at 3.

22. *See* Compl. ¶ 31.

23. *See id.*

24. *See* 12 U.S.C. § 4617.

25. *See id.*

26. *Id.* § 4617(b)(2)(B)(iv).

27. *Id.* § 4617(b)(2)(D)(i).

28. *Id.* § 4617(f).

29. *See* FHFA Mem. at 4. *See also* 12 U.S.C. § 4617(a)(2) ("The Agency may, at the discretion of the Director, be appointed conservator

FHFA "by operation of law, immediately succeed[ed] to all rights, titles, powers, and privileges of the regulated entity."[30]

On May 5, 2010, the Enterprises issued advisories ("Advisories") to lenders and servicers of mortgages owned or guaranteed by the Enterprises.[31] The Advisories stated that the terms of the Fannie Mae/Freddie Mac Uniform Security Instruments prohibit loans that create senior lien status to a mortgage.[32] The Advisories also stated that the Enterprises would provide additional guidance on PACE programs as needed.[33] On July 6, 2010, the FHFA issued the Statement expressing "significant safety and soundness concerns" with certain PACE programs.[34] The Statement directed that the Advisories remain in effect and directed the Enterprises "to undertake [certain] prudential actions."[35] The actions included adjusting loan-to-value ratios; ensuring that loan covenants require approval/consent for any PACE loans; tightening borrower debt-to-income ratios; and ensuring that mortgages on properties with PACE liens satisfy all applicable federal and state lending regulations.[36] The Statement was issued without notice or opportunity for public comment and without any environmental review.[37]

On August 31, 2010, the Enterprises announced that they would not purchase mortgages secured by properties subject to a first-lien PACE obligation.[38] The Enterprises also provided guidelines for refinancing mortgages subject to PACE obligations originating before July 6, 2010.[39]

On February 28, 2011, the FHFA issued a letter ("Letter") to the Enterprises "reaffirm[ing] that PACE programs that provide for first-lien priority over mortgage loans present significant risks to certain assets and property of the Enterprises."[40] The Letter stated that pursuant to section 4617(f) and the FHFA's conservator duty to preserve the assets of the Enterprises, the FHFA is directing the Enterprises to "continue to refrain from purchasing mortgage loans secured by properties with outstanding first-lien PACE obligations" and "undertake other steps as may be necessary to protect their safe and sound operations from these first-lien PACE programs."[41] The FHFA now asserts that the Letter moots the NRDC's claims against the FHFA.[42]

or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity").

30. 12 U.S.C. § 4617(b)(2)(A)(i).

31. *See* FHFA Mem. at 6.

32. *See id.*

33. *See id.*

34. *See id. See also* 7/6/10 FHFA Statement on Certain Energy Retrofit Loan Programs ("Statement"), Ex. A to Compl.

35. *See id.* at 2.

36. *See id.*

37. *See* Opp. Mem. at 7–8.

38. *See* FHFA Mem. at 8.

39. *See id.* at 7.

40. 2/28/11 Letter to the Enterprises ("Letter"), Ex. B to Defendants FHFA and Edward DeMarco's Supplement to Their Motion to Dismiss ("FHFA Supp. Mem.").

41. *Id.*

42. *See* Defendants FHFA and Edward DeMarco's Reply in Support of the Supplement to

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

█ Rule 12(b)(1) provides for the dismissal of a claim when the federal court "lack[s] . . . jurisdiction over the subject matter." Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.[43]

█ In considering a motion to dismiss for lack of subject matter jurisdiction, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."[44] In fact, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."[45] "In deciding the motion, the court 'may consider affidavits and other materi-als beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits.' "[46]

### B. Article III Standing

#### 1. Standing to Sue

█ Article III of the Constitution limits a federal court's jurisdiction to actual "cases and controversies."[47] Constitutional standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."[48] There are three constitutional requirements that a plaintiff must satisfy in order to establish standing: (1) injury-in-fact—an injury that is "concrete and particularized" and is "actual or imminent, not conjectural or hypothetical," (2) an injury that is fairly traceable to the challenged action, and (3) an injury that will likely be redressed by a favorable ruling of the court.[49]

Their Motion to Dismiss ("FHFA Reply Supp. Mem.") at 1.

43. *See Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir.2002). *See also Goonewardena v. New York*, 475 F.Supp.2d 310, 321 (S.D.N.Y.2007) ("[T]he burden of demonstrating that the court has subject matter jurisdiction over the case falls on the plaintiff as it is the plaintiff who seeks to invoke the court's jurisdiction.").

44. *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.2008) (citation and internal quotation marks omitted). *Accord London v. Polishook*, 189 F.3d 196, 199 (2d Cir.1999) ("[I]t is the affirmative burden of the party invoking [federal subject matter] jurisdiction . . . to proffer the necessary factual predicate—not just an allegation in a complaint—to support jurisdiction.") (citations omitted).

45. *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir.1999).

46. *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F.Supp.2d 568, 580–81 (S.D.N.Y.2010) (quoting *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir.2004)) (alteration in original).

47. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

48. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

49. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. *Accord Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir.2006); *New York Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 325 (2d Cir.2003) (finding that the allegations of plaintiffs who lived near facilities subject to the Clean Air Act, "about the health effects of air pollution and [ ] uncertainty" as to whether the EPA's failure to enforce the Clean Air Act exposed them to "excess air pollution," sufficiently established an "injury-in-fact"). *See also Allen v. Wright*, 468 U.S. 737, 751–52, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (noting that the three standing requirements share a common goal—to ensure that the judiciary, and not another branch of govern-

■ "It must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision." [50] "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily substantially more difficult to establish." [51] "[I]t becomes the burden of the plaintiff to adduce facts showing that those choices [of the independent actors not before the court, i.e., the national banks] have been or will be made in such manner as to produce causation and permit redressability of injury." [52]

## 2. Standing to Sue of Behalf of Members

■ "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [53]

### 3. Procedural Injury

■ "The person who has been accorded a procedural right to protect his concrete interests can assert the right without meeting all the normal standards for redressability and immediacy." [54] However, "the redressibility requirement is not toothless in procedural injury cases." [55] To show redressability, "[p]laintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised could protect their concrete interests.'" [56]

## IV. DISCUSSION

### A. The Claims Against the OCC [57]

#### 1. Standing to Pursue Action on Behalf of NRDC Members

■ In order for the NRDC to bring this action on behalf of its members, the NRDC's members must have standing to sue in their own right. [58] The OCC contends that the NRDC members cannot meet the redressability requirement because even if the Court were to vacate the Bulletin, "it would be pure speculation to think that, as a result of the vacatur, the

---

ment, is the appropriate forum in which to address a plaintiff's complaint).

**50.** *Lujan*, 504 U.S. at 559, 112 S.Ct. 2130 (quotation marks and citation omitted). *Accord Mosdos Chofetz Chaim, Inc.*, 701 F.Supp.2d at 584 ("The redressability requirement demands that there is a non-speculative likelihood that the injury can be remedied by the requested relief") (quotation marks and citation omitted).

**51.** *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (quotation marks and citation omitted).

**52.** *Id.*

**53.** *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

**54.** *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130

**55.** *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir.2008).

**56.** *Id.* (quoting *Defenders of Wildlife v. United States Environmental Protection Agency*, 420 F.3d 946, 957 (9th Cir.2005)) (emphasis in original).

**57.** I note that Judge Leonard Wexler in the Eastern District of New York recently issued an opinion addressing some of the same issues with nearly identical facts. *See Town of Babylon v. FHFA, et al.*, 790 F.Supp.2d 47 (E.D.N.Y.2011). However, because the instant case involves a different plaintiff raising different arguments, Judge Wexler's opinion is not dispositive of all the issues raised herein.

**58.** *See Friends of the Earth*, 528 U.S. at 181, 120 S.Ct. 693.

NRDC members would be able to obtain mortgages, or refinance existing mortgages, on properties that are subject to PACE program priority liens." [59]

The NRDC lists three separate injuries on behalf of its members: the Statement and Bulletin (together, "July 6 Directives") (1) harmed the members' health interests; (2) harmed the economic interest of those members who were unable to obtain PACE financing; and (3) caused procedural injury by preventing members from submitting comments on the actions.[60] The redressability issue in the first two alleged injuries are interrelated. Both depend on whether granting relief would result in resumed support for the PACE programs.[61] The OCC argues that, as far as its issuance of the Bulletin is concerned, the NRDC cannot demonstrate redressability because redressability will depend on the national banks resuming their support for PACE programs. There is no way to know whether vacating the Bulletin will cause this to happen.

In response, the NRDC argues that redressability in regards to the Bulletin is not dependent on the national banks because local governments, without awaiting any further action by the national banks, would resume their development and implementation of PACE programs if the Bulletin were vacated.[62] In support of this assertion, the NRDC points to declarations from municipal officials stating that, if the July 6 Directives were vacated, these municipalities would resume development of PACE programs.[63] However, the municipalities cannot resume their development and implementation of PACE programs without the support of the national banks. Local governments halted development of PACE programs when the banks and other mortgage lenders withdrew their support.[64] Redressability then is contingent on the actions of the national banks. The NRDC must therefore show that a vacatur of the Bulletin will likely result in the banks' resumed support of PACE programs.

---

**59.** *See* OCC Mem. at 10.

**60.** *See* Plaintiff's Response to Supplemental Memorandum of Law of Defendants Office of the Comptroller of the Currency and John G. Walsh in Further Support of Their Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) ("NRDC Response to OCC Supp. Mem.") at 1–2.

**61.** *See* Opp. Mem. at 14 ("Both injuries stem from the fact that Defendants' directives froze or curtailed the development of PACE programs. And both injuries are likely to be redressed by vacating Defendants' directives, thereby eliminating the impediment to the resumption of PACE programs.").

**62.** *See* NRDC Response to OCC Supp. Mem. at 2.

**63.** *See id.*

**64.** *See* Declaration of David Gabrielson, Councilman in the Town of Bedford, New York, Executive Director of PACENOW, in Opposition to Motion to Dismiss ¶ 5. ("After the [July 6 Directives], Bedford's and [Northern Westchester Energy Action Consortium's] PACE program efforts ground to a halt. We no longer thought we could access the capital markets to raise funds for the program. In addition, we no longer felt comfortable extending PACE financing to residents because ... mortgage lenders stopped granting mortgages on properties encumbered by PACE liens."). *See also* Declaration of Rodney Dole, Elected Auditor–Controller–Treasurer–Tax Collector of the County of Sonoma in California, in Opposition to Motion to Dismiss ("Dole Decl.") ¶ 5 ("In my experience, prior to the FHFA Statement and the OCC Bulletin, I and other Sonoma County officials were able to address and resolve any concerns *by national banks and other mortgage lenders* .... As a result, I believe that if the [July 6 Directives] were retracted, the PACE program in Sonoma County would return to its full strength.") (emphasis added).

Perhaps anticipating this problem, the NRDC next argues that the Bulletin was the "sole cause" of the national banks withdrawing their support.[65] Until the issuance of the Bulletin, the national banks had accommodated the PACE programs.[66] Therefore, if the Bulletin were vacated, the NRDC argues that the banks would "likely" resume their support of the PACE programs thereby allowing the development of the PACE programs to continue.[67] In support of these assertions, the NRDC relies heavily on the declarations it submitted in opposition to defendants' motions[68] and the fact that "at the pleading stage, facts as alleged are taken as true with reasonable inferences drawn in NRDC's favor."[69]

As noted earlier, however, the NRDC bears the burden of proving jurisdiction by a preponderance of the evidence.[70] Here, the NRDC has failed to carry this burden. In their declarations, the various municipal officials claim that local governments are likely to resume PACE program development once the Bulletin is vacated. However, the resumption of PACE program development will depend on the national banks and not local governments alone. Rodney Dole, an official in Sonoma County, California, has declared that in his "opinion" and "experience," the national banks and other lenders would once again grant mortgages on properties encumbered by PACE liens if the Bulletin were vacated.[71] This unsubstantiated assertion is insufficient to meet the NRDC's burden. Dole's declaration is nothing more than his opinion as to future conduct by non-parties that he does not represent or control. Dole's declaration does not, as the NRDC asserts, "confirm" the likelihood that the NRDC's injuries will be redressed by vacating the Bulletin.[72]

The NRDC's conclusion that a court-ordered vacatur of the Bulletin will prompt the desired reaction from the national banks requires the Court to engage in impermissible speculation. Even if this Court vacated the Bulletin, the national banks would still be subject to OCC regulations and would still be required to consider safety and soundness in making their lending decisions.[73] The national banks would still be free to refuse to grant mortgages on properties encumbered by PACE liens.[74] Therefore, the NRDC has failed to sufficiently allege that its requested re-

---

**65.** *See* NRDC Response to OCC Supp. Mem. at 2. The NRDC asserts that the Bulletin required the national banks to treat all PACE programs with lien priority as per se violations of safety and soundness. *See* Opp. Mem. at 14. The NRDC argues that it is "likely" that the national banks will resume their support of PACE programs once the July 6 directives are removed. *See id. See also* NRDC Response to OCC Supp. Mem. at 3–4.

**66.** *See* NRDC Response to OCC Supp. Mem. at 3.

**67.** Opp. Mem. at 14–15.

**68.** *See id.* at 17 ("The declarations confirm that if the Court were to vacate the July 6 Bulletin and Statement, at least a number of the PACE programs whose development was

halted as a result of the directives would resume, thereby redressing the injuries alleged in NRDC's complaint.").

**69.** *Id.* at 15.

**70.** *See Luckett,* 290 F.3d at 496–97.

**71.** *See* Dole Decl. ¶ 5.

**72.** *See* Opp. Mem. at 19.

**73.** *See* Supplemental Memorandum of Law of Defendants Office of the Comptroller of the Currency and John G. Walsh in Further Support of Their Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1) ("OCC Supp. Mem.") at 3. *See also* 12 C.F.R. Part 30, App. A.

**74.** *See* OCC Supp. Mem. at 3.

lief is "likely" to redress its injuries.[75]

The NRDC's reliance on *The Pitt News v. Fisher* is unavailing.[76] The challenged action in *Pitt News* imposed criminal sanctions against alcohol advertisers placing ads with the plaintiff newspaper leading to the cancellation of their contracts with the newspaper. The Third Circuit inferred from the sudden drop in the newspaper's advertising revenue that if the law were vacated, the newspaper's advertising revenue would increase because advertisers would likely resume placing alcohol-related ads with the newspaper.[77] The NRDC argues that as in *Pitt News*, this Court should look at the decrease in bank support for the PACE programs after the issuance of the Bulletin and infer that the banks will likely resume their support once the Bulletin is revoked. However, unlike the challenged action in *Pitt News*, the Bulletin is not the sole impediment to the banks supporting the PACE programs. The banks have their own safety and soundness criteria that vacating the Bulletin will not affect.[78] There is no basis to infer that vacating the Bulletin will necessarily or "likely" result in renewed participation from the banks.

## 2. Procedural Injury

■ The NRDC argues that it and its members have standing to sue because both have suffered procedural injuries, which would be redressed if the Court declared that the Bulletin violates the NEPA and the APA and forced the OCC to follow proper procedures.[79] The NRDC alleges that the Bulletin has injured the "concrete economic and environmental interests" of its members and therefore it has shown an injury in fact.[80] As to its own standing, the NRDC alleges that it has demonstrated an injury in fact because the July 6 Directives forced the NRDC to devote its resources to "working with federal, state, and local government entities to foster support for and to help develop

---

75. *See Lujan*, 504 U.S. at 569–71, 112 S.Ct. 2130. *See also Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 45–36, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ("Speculative inferences are necessary to connect their injury to the challenged actions of petitioners. Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire. A federal court, properly cognizant of Art. III limitation upon its jurisdiction must require more than respondents have shown before proceeding to the merits."). *See also Town of Babylon*, 790 F.Supp.2d at 55 (finding that vacating the Bulletin would not redress plaintiffs' injury) ("Even if the court were to grant the requested relief with respect to OCC, such action would not require banks to authorize mortgages subject to first lien priority PACE programs. Indeed, banks would still be required, both by OCC regulation and their own prudence, to consider all financial factors, including the existence of first priority liens, in determining whether to grant particular mortgages.").

76. 215 F.3d 354 (3d Cir.2000).

77. *See id.* at 361. It was uncontested that the enforcement of the law led advertisers to cancel their contracts with the newspaper and resulted in a loss of advertising revenue. *See id.* at 359.

78. *See Town of Babylon*, 790 F.Supp.2d at 55 ("It is worth repeating that the July 6 Bulletin did not direct banks to refuse to grant mortgages on properties encumbered with first-priority PACE loans .... [T]he withdrawal of the OCC bulletin, given the banks' independent goal of minimizing risk, would still likely leave banks somewhat averse to granting mortgages subject to first priority PACE liens.").

79. *See* Opp. Mem. at 12 n. 1. *See also* NRDC Response to OCC Supp. Mem. at 4–5.

80. *See* NRDC Response to OCC Supp. Mem. at 4.

PACE programs."[81] This diversion of resources, the NRDC argues, inhibited its ability to pursue its organizational mission of protecting public health and the environment.[82]

Even if these alleged harms constitute an injury in fact, the NRDC and its members must still meet the redressability requirement. While the redressability requirement is relaxed in a procedural injury analysis, I cannot ignore the fact that the banks' actions towards the PACE programs is beyond the influence of this Court.[83] Thus, the NRDC's attempt to establish standing through allegations of procedural injury must fail. The NRDC lacks standing to bring suit on its own behalf as well as on behalf of its members.[84] Accordingly, the NRDC's claim against the OCC is dismissed.

### B. The Claims Against the FHFA

■ The FHFA also moves to dismiss the NRDC's claim under Rules 12(b)(1) and 12(b)(6). The FHFA incorporates the OCC's earlier arguments regarding constitutional standing and additionally claims that section 4617(f) precludes this Court from exercising jurisdiction.[85] The NRDC concedes that the critical question is whether the FHFA's issuance of the Letter constitutes an exercise of a conservatorship power or function.[86] If so, this Court lacks jurisdiction under section 4617(f) and must dismiss the case.[87]

Courts interpreting the scope of section 4617(f) have relied on decisions addressing the nearly identical jurisdictional bar applicable to the Federal Deposit Insurance Corporation ("FDIC") conservatorships contained in 12 U.S.C. § 1821(j).[88] This statute states that "no court may take any action, except at the request of the [FDIC] by regulation or order, to restrain or affect the exercise of powers or functions of the

---

81. *Id.* at 5.

82. *See id.*

83. *See Salmon Spawning*, 545 F.3d at 1227 (finding that plaintiffs, who challenged State Department's decision to enter a salmon management treaty with Canada, could not establish redressability because even if the court gave plaintiffs the procedural remedy they sought—that [the National Marine Fisheries Service] and the State Department follow proper procedures—the ultimate agency decision to enter into a treaty with Canada lies with the Executive Branch and could never be influenced by the courts).

84. *See Friends of the Earth*, 528 U.S. at 181, 120 S.Ct. 693.

85. *See* FHFA Mem. at 11–12 n. 11.

86. *See* Transcript of Conference on March 24, 2011, Ex. 1 to FHFA Supp. Mem., at 5: 12–16 ("[NRDC] agree[s] with respect to the claims against the Federal Housing Financing Agency that if the court were to find that [the Letter] was in fact a proper exercise of the

FHFA conservatorship authority, the anti-injunction bar would apply.").

87. *See id.*

88. The Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") confers similar conservatorship powers on the FDIC; and section 1821(j) of FIRREA provides the FDIC with a similar anti-injunction bar. *See* 12 U.S.C. § 1821(j). *See Kuriakose v. Federal Home Loan Mortgage Co.*, 674 F.Supp.2d 483, 493 (S.D.N.Y. 2009) ("In analyzing the limits of the Court's authority under § 4617(f), the Court may turn to precedent relating to the nearly identical anti-injunction statute under the Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 ('FIRREA')."). *Accord Esther Sadowsky Testamentary Trust v. Syron*, 639 F.Supp.2d 347, 350 (S.D.N.Y. 2009) ("A similar anti-injunction clause in FIRREA, 12 U.S.C. § 1821(j) has been found by several courts to constitute 'a sweeping ouster of courts' power to grant remedies.' ") (quoting *Courtney v. Halleran*, 485 F.3d 942, 948 (7th Cir.2001)).

[FDIC] as a conservator or a receiver."[89] Although courts have interpreted section 1821(j) broadly,[90] relief is nonetheless available when an agency has acted beyond its statutorily prescribed powers or functions.[91]

The NRDC argues that the Letter was not a proper exercise of the FHFA's conservatorship powers.[92] I disagree. Under HERA, the FHFA has the authority to preserve and conserve the assets of the Enterprises, as well as take any action to put the Enterprises in a sound and solvent condition.[93] The Letter attempts to do just that by directing the Enterprises to continue to refrain from purchasing mortgage loans that the FHFA has determined are not in the Enterprises' best interest to purchase.[94] Accordingly, the Letter is a legitimate exercise of the FHFA's powers as conservator to preserve and conserve the assets of the Enterprises.[95]

Because the FHFA was acting within its authority under HERA when it issued the Letter, section 4617(f) applies and bars adjudication of this suit. Therefore, even if the NRDC has constitutional standing to sue the FHFA, this Court lacks jurisdiction under HERA. Accordingly, the NRDC's Complaint against the FHFA is dismissed.

## V. CONCLUSION

For the reasons stated above, the OCC's and the FHFA's motions to dismiss are granted. The Clerk of the Court is ordered to close these motions (docket # 14 and 17) and this case.

SO ORDERED.

89. 12 U.S.C. § 1821(j).

90. *See RPM Invs., Inc. v. Resolution Trust Corp.*, 75 F.3d 618, 620 n. 2 (11th Cir.1996) ("The 'exceptions' to § 1821(j)'s jurisdictional bar are extremely limited.").

91. *See Volges v. Resolution Trust Corp.*, 32 F.3d 50, 52 (2d Cir.1994) (quoting *Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir.1993)) ("[E]ven if the RTC improperly or unlawfully exercised an authorized power or function, it clearly did not engage in an activity outside its statutory powers. Yet only the latter type of act could conceivably subject the RTC to injunction or rescission as an exception to the anti-injunction provisions of § 1821(j)."). *Accord Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir.1992) ("[F]ederal courts have the ability to restrain the RTC where the Corporation is acting clearly outside its statutory powers.").

92. *See* Plaintiff's Response to Defendants FHFA and Edward DeMarco's Supplement to Their Motion to Dismiss ("NRDC Response to FHFA Supp. Mem.") at 3. The NRDC argues that the Letter is not a legitimate exercise of

the FHFA's conservatorship powers because it merely required *continued* compliance with an existing obligation and therefore there was no exercise of a conservatorship power. *See id.* at 4. The NRDC also argues that the Letter constitutes *de facto* rulemaking. *See id.*

93. *See* 12 U.S.C. § 4617(b)(2)(B)(iv); 12 U.S.C. § 4617(b)(2)(D)(i).

94. *See Kuriakose*, 674 F.Supp.2d at 493 (holding that because the FHFA as conservator has the statutory authority under HERA to enforce the contracts of Freddie Mac, declaring portions of certain Freddie Mac contracts unenforceable would interfere with such authority) ("The court lacks jurisdiction to adjudicate matters which may restrict the FHFA's ability to exercise these powers.").

95. *See Town of Babylon*, 790 F.Supp.2d at 54 ("It is clear that any action with respect to PACE financing was taken, as stated specifically by FHFA in [the Letter], in furtherance of its broad powers as conservator of Fannie Mae and Freddie Mac, to ensure the continuing safe and sound operation of [the Enterprises].").